

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

10-1-2008

# Levy v. Sterling Holding Co

Precedential or Non-Precedential: Precedential

Docket No. 07-1849

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"Levy v. Sterling Holding Co" (2008). *2008 Decisions.* Paper 288.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/288

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL


UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____


No. 07-1849
_____


MARK LEVY,
                              Appellant


v.


STERLING HOLDING COMPANY, LLC;
NATIONAL SEMICONDUCTOR CORPORATION;
FAIRCHILD SEMICONDUCTOR INTERNATIONAL,
INC.


_____


On Appeal from the United States District Court
for the District of Delaware
(D.C. Civil No. 00-cv-00994)
District Judge: Honorable Gregory M. Sleet


_____

Argued March 24, 2008

Before:  McKEE, RENDELL, and TASHIMA,*
Circuit Judges

(Filed:  October 1, 2008)

_____

Jeffrey S. Abraham, Esq.   **[ARGUED]**
Abraham, Fruchter & Twersky
One Penn Plaza, Suite 2805
New York, NY    10119-0000
*Counsel for Plaintiff-Appellant*
*Mark Levy*

*(continued)*

_____

    **\*** Honorable A. Wallace Tashima, Senior Judge of the
    United States Court of Appeals for the Ninth Circuit,
    sitting by designation.

Carolyn H. Feeney, Esq.
Steven B. Feirson, Esq.   **[ARGUED]**
Dechert
Cira Centre, 18th Floor
2929 Arch Street
Philadelphia, PA    19104-0000
*Counsel for Defendant-Appellee*
*Sterling Holding Company, LLC*

Paul Vizcarrondo, Jr., Esq.
Wachtell, Lipton, Rosen & Katz
51 West 52nd Street
New York, NY   10019-0000
*Counsel for Defendant-Appellee*
*National Semiconductor Corporation*

Megan W. Casio, Esq.
Morris, Nichols, Arsht & Tunnell
1201 North Market Street
P. O. Box 1347
Wilmington, DE   19899-0000
*Counsel for Defendant–Non-Participating*
*Fairchild Semiconductor International, Inc.*

Allan A. Capute, Esq.    **[ARGUED]**
Securities & Exchange Commission
100 F Street, N.E.
Washington, DC  20549-0000
*Counsel for Securities and Exchange Commission*
*Amicus Appellee*

3

OPINION OF THE COURT

RENDELL, Circuit Judge.

Mark Levy filed a shareholder derivative suit on behalf of Fairchild Semiconductor International, Inc. ("Fairchild") against Sterling Holding Company, LLC ("Sterling") and National Semiconductor Corporation ("National") for disgorgement of short-swing profits, pursuant to section 16(b) of the Exchange Act of 1934. National and Sterling contend that two separate SEC Rules, 16b-3 and 16b-7, exempt them from section 16(b) liability. When this case was before us previously, at the motion-to-dismiss stage, we ruled that neither exemption applied here. *Levy v. Sterling Holding Co.* (*Levy I*), 314 F.3d 106 (3d Cir. 2002). Thereafter, however, the SEC amended Rules 16b-3 and 16b-7 to, as it put it, "clarify the exemptive scope" of these two Rules, making clear that both apply to the instant fact pattern. Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Exchange Act Release No. 52,202 ("2005 Amendments Release"), 70 Fed. Reg. 46,080, 46,080 (Aug. 9, 2005). The District Court then ruled in favor of National and Sterling and against Levy on cross motions for summary judgment. We must

decide whether our rulings in *Levy I*, or the SEC's more-recent Rule amendments, govern the case at this stage. For the reasons that follow, we conclude that at least one of the amendments is controlling and, therefore, we will affirm the District Court's grant of summary judgment to National and Sterling, and its denial of summary judgment to Levy.

## I.

## A.

In 1997, Fairchild was spun off from National as a new company. Three classes of Fairchild stock were created: (1) Class A common stock; (2) Class B common stock, which differed from Class A common because it did not entail voting rights; and (3) preferred stock, which offered a cumulative 12% dividend. Class A common and Class B common were freely convertible into each another, but preferred stock was not convertible into either Class of common. National received a mix of all three classes of stock and, in exchange for its $58.5 million investment in the new company, so did Sterling. The only other initial investors were a number of National employees slated to become key Fairchild employees. The governing shareholder agreement gave National the power to designate one of Fairchild's seven directors and gave Sterling the power to designate two.

In 1999, Fairchild decided to undertake an initial public offering ("IPO") to raise additional capital and was told by a number of underwriters that it should eliminate its preferred stock in order for the IPO to be successful. Consistent with this advice, a majority of Fairchild's board voted that, as part of the IPO, all of the company's outstanding shares of preferred stock would automatically be reclassified as shares of Class A common stock. A majority of each of the three classes of shareholders subsequently approved the reclassification by written consent. Preferred shares were to be valued at their contractual liquidation value — the original price plus accumulated unpaid dividends — and Class A common shares were to be valued at the price at which the Class A shares would be offered to the public in the IPO, less underwriting fees and commissions. Dividing the former by the latter yielded a 76-to-1 conversion ratio, meaning that each share of preferred stock would become 76 shares of Class A common.[1] Prior to the execution of the IPO, according to the IPO prospectus, Sterling owned 48% of the outstanding Class A common, 85.1% of the outstanding Class B common, and 75.9% of the outstanding preferred, while National owned 14.8%, 14.9%, and 16.7%, respectively.

On August 9, 1999, the IPO was completed and the shares of preferred stock owned by Sterling and National were

_____

[1] We have rounded off the figures throughout this opinion because the precise figures are unimportant.

6

reclassified as 4 million and 900,000 shares of Class A common, respectively. On January 19, 2000 — less than six months later — with Fairchild undertaking a secondary offering of Class A common stock, Sterling sold 11 million shares of Class A common and National sold 7 million shares of Class A common. The share price of Class A common had increased 84% since the reclassification.

**B.**

In November 2000, Levy, a Fairchild shareholder, filed a derivative suit against National and Sterling, pursuant to section 16(b) of the Securities and Exchange Act of 1934, which generally provides for the disgorgement of any profits earned by statutory insiders from short-swing trading. *See* 15 U.S.C. § 78p(b).[2] The four elements required for section 16(b) liability

---

[2] Section 16(b) provides, in pertinent part:

> For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer (other than an exempted security) or a security-based swap agreement . . . involving any such equity security within any period of less than six months, unless such security or security-based

7

are (1) a purchase of a security and (2) a sale of that security (3) by a director or officer of the issuer or by a beneficial owner of 10% of any Class of the issuer's securities (4) within a six-month period. *See id.*; *Levy I*, 314 F.3d at 111. As a general rule, any profits earned through transactions that meet these elements rightfully belong to the issuer. There is no *mens rea* requirement — section 16(b) creates a strict liability regime.

---

swap agreement was acquired in good faith in connection with a debt previously contracted, shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security or security-based swap agreement purchased or of not repurchasing the security or security-based swap agreement sold for a period exceeding six months. . . . This subsection shall not be construed to cover any transaction where such beneficial owner was not such both at the time of the purchase and sale, or the sale and purchase, of the security or security-based swap agreement . . . involved, or any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection.

Securities Exchange Act of 1934 § 16(b), 15 U.S.C. § 78p(b).

According to the statute itself, the purpose of section 16(b) is "preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer." 15 U.S.C. § 78p(b). The statute authorizes the SEC to promulgate rules and regulations exempting from liability transactions that are "not comprehended within [this] purpose." *Id.*; *see Levy I*, 314 F.3d at 112. Exercising this authority, the SEC has established a number of section 16(b) exemptions. *See* 17 C.F.R. §§ 240.16b-1, .16b-3, .16b-5 to .16b-8 (codifying SEC Rules 16b-1, 16b-3, and 16b-5 to 16b-8).

Levy claimed that the reclassification of National's and Sterling's preferred stock holdings constituted a "purchase" of Class A common stock so that the profits that National and Sterling earned from their sale of Class A common less than six months later belong to Fairchild. National and Sterling filed motions to dismiss, contending that two separate exemptions — Rule 16b-3 and Rule 16b-7 — shielded them from section 16(b) liability.[3]

---

[3] National and Sterling also maintained — and continue to maintain — that, under the so-called "unorthodox transaction" doctrine, the reclassification did not constitute a "purchase" for section 16(b) purposes. *See Kern County Land Co. v. Occidental Petroleum Corp.*, 411 U.S. 582, 593-94 (1973). We will refrain from addressing this argument because our analysis of Rules 16b-3 and 16b-7 below makes it unnecessary for us to

Adopted in 1996, the version of Rule 16b-3 that was in effect until 2005 provided, in pertinent part:

> Transactions between an issuer and its officers or directors.
>
> (a) General. A transaction between the issuer (including an employee benefit plan sponsored by the issuer) and an officer or director of the issuer that involves issuer equity securities shall be exempt from section 16(b) of the Act if the transaction satisfies the applicable conditions set forth in this section.
>
> . . . .
>
> (d) Grants, awards and other acquisitions from the issuer. Any transaction involving a grant, award or other acquisition from the issuer (other than a Discretionary Transaction) shall be exempt if:
>
> > (1) The transaction is approved by the board of directors of the issuer . . . ;
> >
> > (2) The transaction is approved or ratified by . . . the written consent of the holders of

do so.

10

a majority of the securities of the issuer entitled to vote . . . ; or

(3) The issuer equity securities so acquired are held by the officer or director for a period of six months following the date of such    acquisition . . . .

17 C.F.R. § 240.16b-3 (amended 2005).

The 1991 version of Rule 16b-7, which remained in effect until 2005, provided, in pertinent part:

Mergers, reclassifications, and consolidations.

(a) The following transactions shall be exempt from the provisions of section 16(b) of the Act:

(1) The acquisition of a security of a company, pursuant to a merger or consolidation, in exchange for a security of a company which, prior to the merger or consolidation, owned 85 percent or more of either:

(i)  The equity securities of all other companies involved in the merger or

11

consolidation, or in the case of a consolidation, the resulting company; or

(ii) The combined assets of all the companies involved in the merger or consolidation . . . .

17 C.F.R. § 240.16b-7 (amended 2005). Even though the SEC added the word "reclassifications" to the Rule's title in 1991, the Rule's text did not specifically refer to them.

National and Sterling argued that Rule 16b-3(d) exempted them from any liability related to the reclassification because the reclassification fit within the category of a "grant, award, or other acquisition from the issuer" — as an "other acquisition" — and was approved by a majority of Fairchild's board and a majority of the voting shareholders (even though approval by either of the two would have sufficed). They maintained that Rule 16b-7's exemption applied as well because they acquired the disputed Class A common stock as part of a "reclassification" that met the Rule's 85% cross-ownership requirement.

The District Court granted National's and Sterling's motions to dismiss, finding that the reclassification fell within the scope of Rule 16b-7 and that Levy's section 16(b) suit thus necessarily failed. The Court did not rule on the applicability of Rule 16b-3(d). Levy then appealed to our Court.

## C.

In an opinion filed December 19, 2002, we reversed, concluding that neither Rule 16b-3(d) nor Rule 16b-7 exempted National or Sterling from section 16(b) liability. As to Rule 16b-3(d), we reasoned that, despite the apparent open-endedness of the language "other acquisition from the issuer," and despite the fact that the Rule made no mention of "compensation," the SEC intended it to apply only to transactions with a compensatory nexus. *Levy I*, 314 F.3d at 120-24. We reviewed in depth the release issued by the SEC in 1996 in connection with the adoption of the Rule, and relied on a number of excerpts that, we thought, indicated that the SEC adopted the 1996 version of the Rule in order to spur participation in employee benefit plans and to make it clear that the exemption applied to participant-directed transactions, such as the exercise of a stock option. *Id.* at 122-24. We did acknowledge, however, that one portion of the release "appear[ed] to cut against our position" that Rule 16b-3(d) required a compensatory nexus. *Id.* at 124. In that portion, the SEC explained:

> New Rule 16b-3 exempts from short-swing profit recovery any acquisitions and dispositions of issuer equity securities . . . between an officer or director and the issuer, subject to simplified conditions. A transaction with an employee benefit plan sponsored by the issuer will be

13

> treated the same as a transaction with the issuer. However, unlike the current rule, *a transaction need not be pursuant to an employee benefit plan or any compensatory program to be exempt, nor need it specifically have a compensatory element*.

Ownership Reports and Trading by Officers, Directors and Principal Security Holders, Exchange Act Release No. 37,260 ("1996 Rule 16b-3 Release"), 61 Fed. Reg. 30,376, 30,378-79 (June 14, 1996) (emphasis added) (footnotes omitted). Nonetheless, we concluded that "the weight of the SEC's pronouncements on Rule 16b-3, and particularly Rule 16b-3(d), suggest that the transaction should have some connection to a compensation-related function." *Levy I*, 314 F.3d at 124.

Examining the applicability of the exemption set forth in Rule 16b-7, we began our analysis by noting that "the SEC has not set forth its interpretation clearly so our threshold challenge is to ascertain what in fact was its interpretation." *Id.* at 112. We reasoned that the SEC must have added "reclassifications" to the Rule's title for a reason, but found that, "[u]nfortunately, . . . the title and text of the rule, standing alone, do not provide us assistance in our effort to ascertain the SEC's purpose." *Id.* at 113.

Based on a pair of SEC releases, we concluded that the SEC intended for Rule 16b-7 to exempt some, but not all, reclassifications from section 16(b) liability. *Id.* at 113-15. The

first release was from 1981 (i.e., ten years before "reclassifications" was added to the Rule's title) and included a question and answer regarding the Rule's applicability to reclassifications:

> Question: Although not specifically mentioned, does Rule 16b-7 apply to transactions structured as (1) statutory exchanges; (2) liquidations; or (3) *reclassifications*?

> Answer: The staff is of the view that, for purposes of Rule 16b-7, a statutory exchange may be the substantive equivalent of a merger, consolidation or sale of assets. Therefore, the acquisition and disposition of stock in a statutory exchange would be exempt under Rule 16b-7, assuming all of the conditions of the rule are satisfied. A liquidation, on the other hand, is not covered by Rule 16b-7, since the liquidation in substance and purpose bears little resemblance to the types of transactions specified in the rule. Rule 16b-7 does not require that the security received in exchange be similar to that surrendered, and *the rule can apply to transactions involving reclassifications*.

Interpretive Release on Rules Applicable to Insider Reporting and Trading, Exchange Act Release No. 18,114, 46 Fed. Reg.

15

48,147, 48,176-77 (Oct. 1, 1981) (emphasis added) (footnotes omitted). Essentially, we read the language "can apply" to mean "sometimes applies." *Levy I*, 314 F.3d at 113-14.

The second release, from 2002, pertained to proposed amendments to Form 8-K and exempted from reporting requirements "[a]cquisitions or dispositions pursuant to holding company formations and similar corporate *reclassifications* and consolidations." Form 8-K Disclosure of Certain Management Transactions, Exchange Act Release No. 45,742, 67 Fed. Reg. 19,914, 19,919 (Apr. 23, 2002) (emphasis added). It noted that "[t]hese are the transactions exempted from Section 16(b) short-swing profit recovery by Exchange Act Rule 16b-7." *Id.* at 19,919 n.56. We reasoned that this release "does not suggest that all reclassifications are *per se* exempt" and that, because it "clearly hedges on the point," it "thus supports a conclusion that some but not all reclassifications are exempt from section 16(b)'s restrictions." *Levy I*, 314 F.3d at 114.

Next, lacking "specific SEC guidance about which reclassifications are exempt from section 16(b) under Rule 16b-7," we devised a two-part test, under which a particular reclassification would be exempt if it (1) met the 85% cross-ownership requirements that the Rule clearly made applicable to mergers and consolidations and (2) was a transaction "not comprehended within the purpose" of section 16(b). *Id.* at 114-15 (quoting 15 U.S.C. § 78p(b)).

16

Applying our newly-created test, we found that the reclassification here failed part two — at least at the motion-to-dismiss stage. *Id.* at 115-18. We rejected National and Sterling's argument that the reclassification changed only the form, not the substance, of their investments in Fairchild such that it did not present an opportunity for insiders to benefit over the public and thus did not implicate Congress's purpose in enacting section 16(b). Indeed, we concluded that it did present such an opportunity. We based our conclusion on two independent grounds. First, we found that, reading the pleadings in the light most favorable to Levy, the reclassification proportionately increased National's and Sterling's interests in Fairchild by leaving them with a greater percentage of Fairchild's common stock. *Id.* at 116-17. Second, after contrasting the pros and cons of common-stock and preferred-stock ownership, we decided that the reclassification "so chang[ed] the risks and opportunities of the preferred shareholders in [Fairchild[4]] that the SEC would not have intended to exempt the reclassification from section 16(b) by Rule 16b-7." *Id.* at 117-18.

National and Sterling petitioned for rehearing, and the SEC submitted an amicus brief in support. We denied the rehearing request, despite the fact that the SEC maintained in its

---

[4] While we wrote "National and Sterling" here, the context makes clear that this was a mistake and that we meant to write "Fairchild."

17

brief that our ruling in *Levy I* was inconsistent with its view that both exemptions applied here.[5]

## D.

In 2005, in response to our opinion in *Levy I*, the SEC adopted amendments to Rules 16b-3 and 16b-7 in order "to clarify the exemptive scope of these rules, consistent with statements in previous Commission releases." 2005 Amendments Release, 70 Fed. Reg. at 46,080. The SEC explained its disagreement with *Levy I* and its impetus for the amendments in the adopting release:

> In particular, the *Levy v. Sterling* opinion read Rules 16b-3 and 16b-7 to require satisfaction of conditions that were neither contained in the text of the rules nor intended by the Commission. The resulting uncertainty regarding the exemptive scope of these rules has made it difficult for issuers and insiders to plan legitimate transactions, and may discourage participation by officers and directors in issuer stock ownership

---

[5] Despite Levy's contention to the contrary, "[t]he failure of a petition to achieve the necessary votes for rehearing does not . . . imply any judgment on the merits and has no jurisprudential significance." *In re Grand Jury Investigation*, 542 F.2d 166, 173 (3d Cir. 1976).

18

programs or employee incentive plans. With the clarifying amendments to Rules 16b-3 and 16b-7 that we adopt today, we resolve any doubt as to the meaning and interpretation of these rules by reaffirming the views we have consistently expressed previously regarding their appropriate construction.

*Id.* at 46,081.

Rule 16b-3(d) was amended to read, in pertinent part:

(d) Acquisitions from the issuer. Any transaction, other than a Discretionary Transaction, involving an acquisition [by an officer or director] from the issuer (including without limitation a grant or award), whether or not intended for a compensatory or other particular purpose, shall be exempt if [one of the same three conditions from the 1996 version of the Rule are met].

17 C.F.R. § 240.16b-3(d) (new material underlined). Thus, there is now no doubt that Rule 16b-3(d) does *not* require a compensatory nexus.

Rule 16b-7 was amended to read, in pertinent part:

19

(a) The following transactions shall be exempt from the provisions of section 16(b) of the Act:

(1) The acquisition of a security of a company, pursuant to a merger, reclassification or consolidation, in exchange for a security of a company that before the merger, reclassification or consolidation, owned 85 percent or more of either:

(i) The equity securities of all other companies involved in the merger, reclassification, or consolidation, or in the case of a consolidation, the resulting company; or

(ii) The combined assets of all the companies involved in the merger, reclassification, or consolidation . . . .

. . . .

(c) The exemption provided by this section applies to any securities transaction that satisfies the conditions specified in this section and is not conditioned on the transaction satisfying any other conditions.

20

17 C.F.R. § 240.16b-7 (new material underlined).  Thus, there is no now no doubt that Rule 16b-7 applies to any reclassification that meets the Rule's 85% cross-ownership requirement.

Further, the SEC explicitly indicated that "because [the Rule 16b-3 amendments] clarify regulatory conditions that applied to [that exemption] since [it] became effective on August 15, 1996, they are available to any transaction on or after August 15, 1996 that satisfies the regulatory conditions so clarified." 2005 Amendments Release, 70 Fed. Reg. at 46,080.  The SEC similarly made clear its view that "because [the Rule 16b-7 amendments] clarif[y] regulatory conditions that applied to that exemption since it was amended effective May 1, 1991, [they are] available to any transaction on or after May 1, 1991 that satisfies the regulatory conditions so clarified." *Id.*  The transaction at issue here occurred in August 1999 — well after both of these dates, but six years before the adoption of the "clarifying" regulations.

## E.

Before the adoption of the 2005 amendments, Levy, National, and Sterling had filed cross motions for summary judgment.  After the amendments were adopted, the District Court denied Levy's motion and granted those of National and Sterling, finding that the new versions of both Rules applied to the 1999 reclassification and shielded National and Sterling

21

from section 16(b) liability. *Levy v. Sterling Holding Co.*, 475 F. Supp. 2d 463 (D. Del. 2007). Specifically, the Court concluded that the new Rules were permissible constructions of section 16(b), *id.* at 470-74, and that applying them here would have no impermissible retroactive effect because the changes made to the old Rules were "clarifying" rather than "substantive," *id.* at 475-78. Levy then filed this timely appeal.

## II.

The District Court had jurisdiction pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1331, and we now have appellate jurisdiction pursuant to 28 U.S.C. § 1291.[6] We review *de novo* the grant or denial of summary judgment by a district court. *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 276 (3d Cir.2001). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

---

[6] Although denials of summary judgment usually are not appealable, we have repeatedly made clear that "'when an appeal from a denial of summary judgment is raised in tandem with an appeal of an order granting a cross-motion for summary judgment, we have jurisdiction to review the propriety of the denial of summary judgment by the district court.'" *Transportes Ferreos de Venezuela II CA v. NKK Corp.*, 239 F.3d 555, 560 (3d Cir. 2001) (quoting *Nazay v. Miller*, 949 F.2d 1323, 1328 (3d Cir. 1991)).

there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

## III.

Levy raises three issues on appeal. First, he maintains that, under the doctrine of *stare decisis*, the mandate that we issued in *Levy I* requires the grant of summary judgment in his favor. Second, Levy contends that new Rule 16b-3 and new Rule 16b-7 both exceed the authority that Congress delegated to the SEC in section 16(b). Third, he asserts that applying either of the new Rules to exempt National's or Sterling's acquisition of Class A common stock through Fairchild's 1999 reclassification would have an impermissible retroactive effect. Levy does not argue, however, that the transactions at issue failed in any way to meet the requirements of the *new* Rules. Thus, he has effectively conceded that if we were to conclude that either of the new Rules is a permissible exercise of the SEC's authority that may properly be applied to a 1999 reclassification, we would affirm the District Court's grant of summary judgment to National and Sterling and its denial of his motion for summary judgment.

## A.

Levy argues that the following three premises, together, require the grant of summary judgment in his favor: (1) all four

23

elements of a section 16(b) violation were met by both National and Sterling; (2) we already ruled in *Levy I* that neither Rule 16b-3 nor Rule 16b-7 exempted National or Sterling from liability; and (3) prior panel decisions may only be overruled by our Court sitting en banc, which has not happened here. Even assuming that these premises are correct, however, Levy's proposed conclusion does not follow from them.

In *National Cable & Telecommunications Associates v. Brand X Internet Services*, 545 U.S. 967 (2005), the Supreme Court left no doubt that if a court of appeals interprets an ambiguous statute one way, and the agency charged with administering that statute subsequently interprets it another way, even that same court of appeals may not then ignore the agency's more-recent interpretation. In 2000, the United States Court of Appeals for the Ninth Circuit held that broadband cable Internet service constituted a "telecommunications service" under Title II of the Communications Act, a classification with significant regulatory implications. *Id*. at 979-80. In 2002, however, the Federal Communications Commission ("FCC") issued a declaratory ruling that the term "telecommunications service" *did not* encompass broadband cable Internet service. *Id.* at 977-78. When numerous parties challenged the FCC ruling, the Ninth Circuit held, under principles of *stare decisis*, that it was bound by its interpretation of "telecommunications service," notwithstanding the FCC's conflicting interpretation from two years later. *Id.* at 979-80.

The Supreme Court reversed, explaining that "[a] court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference[7] only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Id.* at 982. The Court reasoned that "allowing a judicial precedent to foreclose an agency from interpreting an ambiguous statute . . . would allow a court's interpretation to override an agency's," which would fly in the face of "*Chevron*'s premise . . . that it is for agencies, not courts, to fill statutory gaps." *Id.* Further, the Court emphasized, the Ninth Circuit's approach "would produce anomalous results," as the relative weight of conflicting judicial and agency interpretations of an ambiguous statute "would turn on the order in which the interpretations issue." *Id.* at 983; *see also Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 744 n.3 (1996) ("Where . . . a court is addressing transactions that occurred at a time when there was no clear agency guidance, it would be absurd to ignore the agency's current authoritative pronouncement of what the statute means."); *Reich v. D.M. Sabia Co.*, 90 F.3d 854, 858 (3d Cir. 1996) ("Although a panel of this court is bound by, and lacks authority to overrule, a published decision of a prior panel,

[7] As discussed below, under *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, courts generally must accord great deference to an agency's interpretation of a statute that Congress has authorized it to administer. 467 U.S. 837, 842-43 (1984).

25

a panel may reevaluate a precedent in light of intervening authority and amendments to statutes *or regulations*." (emphasis added) (citation omitted)).

We see no reason why these principles should not apply equally to the interpretation of a regulation. After all, "[w]hen the construction of an administrative regulation rather than a statute is in issue, deference is even more clearly in order." *Udall v. Tallman*, 380 U.S. 1, 16-17 (1965); *see also Facchiano Constr. Co. v. U.S. Dep't of Labor*, 987 F.2d 206, 213 (3d Cir. 1993) ("[A]n administrative agency's interpretation of its own regulation receives even greater deference than that accorded to its interpretation of a statute."). Accordingly, we conclude that a judicial opinion construing an agency's regulation does not necessarily bar a court from giving effect to a subsequent, different interpretation by the agency, unless, according to the earlier opinion, the judicial construction flowed unambiguously from the terms of the regulation. To find otherwise would produce the same "anomalous results" that the *Brand X* Court sought to avoid, creating a first-in-time rule for determining whether a judicial or administrative interpretation of a regulation is authoritative.

We reached a similar conclusion in a similar context in *United States v. Marmolejos*, 140 F.3d 488 (3d Cir. 1998), a case that involved an amendment by the Sentencing Commission of an application note that accompanied an ambiguous section of the Sentencing Guidelines. There, we

26

made clear that an earlier, conflicting judicial construction of the ambiguous Guidelines section did not preclude us from considering the more-recent interpretation of that section provided by the Commission in the application note amendment. *Id.* at 492-93 & n.7. In such a situation, we explained, "'this court is not bound to close its eyes to the new source of enlightenment.'" *Id.* at 493 (quoting *United States v. Joshua*, 976 F.2d 844, 855 (3d Cir. 1992)). Importantly, as we noted in *Marmolejos*, the Supreme Court has analogized Sentencing Commission commentary on the Guidelines to an agency's interpretation of its own rules. *Id.* at 493 n.7 (citing *Stinson v. United States*, 508 U.S. 36, 44-45 (1993)).

Here, the new Rules constitute both (1) interpretations of a statute, as they construe the provision of section 16(b) granting the SEC authority to exempt transactions "not comprehended within [the statute's] purpose," and (2) interpretations of regulations, as they set forth the SEC's understanding of what the old Rules meant all along. Looking at the new Rules from either perspective, it is clear that, notwithstanding the doctrine of *stare decisis*, *Levy I* does not necessarily foreclose us from considering them. In *Levy I*, we did not conclude that section 16(b) unambiguously precluded the SEC from exempting transactions like the 1999 reclassification. Similarly, we did not indicate that our reading of old Rule 16b-3 or of old Rule 16b-7 flowed unambiguously from their terms. Indeed, we struggled to divine their applicability to the instant fact pattern. With respect to Rule 16b-3, we concluded only that "the weight of the

27

SEC's pronouncements . . . *suggest[ed]*" that we should read in a compensatory nexus requirement.  *Levy I*, 314 F.3d at 124 (emphasis added).  Further, we recognized that a portion of the SEC's adopting release "appear[ed] to cut against" this interpretation.  *Id.*  As to Rule 16b-7, we repeatedly noted the lack of clear guidance in the text or elsewhere regarding whether and to what extent reclassifications fell within the Rule's scope. *Id.* at 112-14.  Our conclusion as to both represented our view of what the SEC probably intended.

Accordingly, *Levy I* does not control the result here simply by virtue of the fact that it came first and has not been overturned.

**B.**

Levy also contends that new Rule 16b-3 and new Rule 16b-7 are improper exercises of the authority that Congress granted the SEC in section 16(b).  This argument equates to a claim that both new Rules are impermissible interpretations of the portion of the statute that provides that section 16(b) does not apply to "any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection." 15 U.S.C. § 78p(b).  Because *Chevron* deference applies here, and the statutory interpretations embodied in the new Rules easily pass

28

muster under this lenient standard, we disagree with Levy on this issue as well.

*Chevron* deference applies to an agency's statutory interpretation "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States. v. Mead Corp.*, 533 U.S. 218, 226-27 (2001). If we determine that the situation does indeed call for *Chevron* deference, we proceed to a two-step inquiry. First, we ask "whether Congress has directly spoken to the precise question at issue." *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). If the answer is yes, we "must give effect to the unambiguously expressed intent of Congress" and our inquiry ends there. *Id.* at 842-43. If, however, the answer is no, we move on to step two, under which we must give the agency's interpretation "controlling weight" unless it is "arbitrary, capricious, or manifestly contrary to the statute." *Id.* at 843. In other words, where Congress has left a "statutory gap" for the agency to fill, we must accept any interpretation by the agency that fills the gap "in reasonable fashion." *Brand X*, 545 U.S. at 980.

Here, Congress has generally authorized the SEC to make rules that have the force of law in implementing the Exchange Act, Securities Exchange Act of 1934 § 23(a), 15 U.S.C. § 78w(a), and has specifically authorized it to create binding

exemptions from short-swing profit recovery, 15 U.S.C. § 78p(b). Because the SEC was acting pursuant to this authority when it promulgated new Rule 16b-3 and new Rule 16b-7, *Chevron* deference clearly applies. *See* 2005 Amendments Release, 70 Fed. Reg. at 46,084-85 & nn.54, 71. Further, by broadly pronouncing that section 16(b) does not apply to "any transaction or transactions which the Commission by rules and regulations may exempt as not comprehended within the purpose of this subsection," 15 U.S.C. § 78p(b), Congress certainly left a gap for the agency to fill. Thus, the key question for us to answer is whether it was reasonable for the SEC to think that the transactions exempted by the new Rules are "not comprehended within the purpose" of section 16(b).

As noted above, section 16(b)'s self-proclaimed purpose is "preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer." 15 U.S.C. § 78p(b). The Supreme Court has expanded upon this purpose:

> The general purpose of Congress in enacting s[ection] 16(b) is well known. Congress recognized that insiders may have access to information about their corporations not available to the rest of the investing public. By trading on this information, these persons could reap profits at the expense of less well informed investors. In

30

s[ection] 16(b) Congress sought to "curb the evils of insider trading [by] . . . taking the profits out of a Class of transactions in which the possibility of abuse was believed to be intolerably great."  It accomplished this by defining directors, officers, and beneficial owners as those presumed to have access to inside information and enacting a flat rule that a corporation could recover the profits these insiders made on a pair of security transactions within six months.

*Foremost-McKesson, Inc. v. Provident Sec. Co.*, 423 U.S. 232, 243-44 (1976) (alterations in original) (citations and footnotes omitted) (quoting *Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 422 (1972)).

In the 2005 adopting release, the SEC explained why it believed the transactions exempted by new Rule 16b-3 — transactions between directors or officers and the issuer — were not comprehended within this purpose:

Typically, where the issuer, rather than the trading markets, is on the other side of an officer or director's transaction in the issuer's equity securities, any profit obtained is not at the expense of uninformed shareholders and other market participants of the type contemplated by the statute.

31

2005 Amendments Release, 70 Fed. Reg. at 46,083 (quoting 1996 Rule 16b-3 Release, 61 Fed. Reg. at 30,377).

In other words, the purchase of securities from, or sale of securities to, the issuer by a director or officer does not present the same informational asymmetry, and associated opportunity for speculative abuse, that, according to the Supreme Court, Congress was targeting in enacting section 16(b). Because this rationale is perfectly reasonable — and applies equally whether or not the transaction has a compensatory nexus — we conclude that new Rule 16b-3 is a permissible construction of section 16(b) and a valid exercise of the SEC's congressionally delegated authority.[8] The two courts of appeals that have considered this question reached the same conclusion. *Roth v.*

_____

[8] Levy maintains that the SEC's reasoning is flawed because it "ignores [the fact] that such unfair short-term speculative activity *can* take place even absent a transaction with an uninformed member of the investing public." (Appellant's Br. 60 (emphasis added)). But Levy's argument is based on a faulty premise, as a transaction "need not . . . pose absolutely no risk of speculative abuse" for the SEC to be free to exempt it from section 16(b) liability. *Dreiling v. Am. Express Co.*, 458 F.3d 942, 950 (9th Cir. 2006). Rather, as indicated by the Supreme Court in its above explanation of section 16(b)'s purpose, the relevant inquiry is whether the risk of speculative abuse is not "'intolerably great.'" *Foremost-McKesson, Inc.*, 423 U.S. at 243 (quoting *Reliance Elec. Co.*, 404 U.S. at 422); *accord Dreiling*, 458 F.3d at 950 .

32

*Perseus, L.L.C.*, 522 F.3d 242, 249 (2d Cir. 2008); *Dreiling v. Am. Express Co.*, 458 F.3d 942, 949-52 (9th Cir. 2006).

As for new Rule 16b-7, the SEC explained in the 2005 adopting release that it is "based on the premise that the exempted transactions" — including reclassifications — "are of relatively minor importance to the shareholders of a particular company and do not present significant opportunities to insiders to profit by advance information concerning the transaction." 2005 Amendments Release, 70 Fed. Reg. at 46,085. "Indeed," the SEC continued, "by satisfying either of the rule's 85% ownership tests, an exempted transaction does not significantly alter the economic investment held by the insider before the transaction." *Id.* In essence, the SEC's position is that reclassifications, in addition to mergers and consolidations, that meet the 85% cross-ownership requirement do not pose much risk of abuse of inside information because they usually change merely the form of the insider's pre-existing investment in the issuer. *Id.* We think this is a reasonable explanation as to why the exempted transactions are not comprehended within the purpose of section 16(b) and, therefore, conclude that new Rule 16b-7, like new Rule 16b-3, is a permissible construction of section 16(b) and a valid exercise of the authority delegated to the SEC by Congress. We note that the only other court of appeals to have faced this issue as to Rule 16b-7 agreed, finding that new Rule "falls safely within the Commission's delegated authority." *Bruh v. Bessemer Venture Partners III L.P.*, 464 F.3d 202, 214 (2d Cir. 2006).

33

## C.

Finally, Levy contends that, even if *Levy I* does not bind us for any of the reasons discussed above, and even if the new Rules are permissible constructions of section 16(b), actually applying the new Rules here to the 1999 reclassification would have an impermissible retroactive effect

Drawing on the well-established principle that "[r]etroactivity is not favored in the law," the Supreme Court held in *Bowen v. Georgetown University Hospital*, 488 U.S. 204, 208 (1988), that an agency may not promulgate rules that operate retroactively unless Congress has expressly delegated to it the authority to do so. However, we have held that a new rule should not be deemed to be "retroactive" in its operation — and thus does not implicate the Supreme Court's concerns in *Bowen* — if it "d[oes] not alter existing rights or obligations [but] merely clarifie[s] what those existing rights and obligations ha[ve] always been." *Appalachian States Low-Level Radioactive Waste Comm'n v. O'Leary*, 93 F.3d 103, 113 (3d Cir. 1996). Thus, where a new rule constitutes a clarification — rather than a substantive change — of the law as it existed beforehand, the application of that new rule to pre-promulgation conduct necessarily does *not* have an impermissible retroactive effect, regardless of whether Congress has delegated retroactive rulemaking power to the agency.

Many of our sister courts of appeals have endorsed similar approaches, finding retroactivity to be a non-issue with respect to new laws that clarify existing law. *See, e.g.*, *Piamba Cortes v. Am. Airlines, Inc.*, 177 F.3d 1272, 1283 (11th Cir. 1999) ("[C]oncerns about retroactive application are not implicated when an amendment that takes effect after the initiation of a lawsuit is deemed to clarify relevant law rather than effect a substantive change in the law."); *Pope v. Shalala*, 998 F.2d 473, 483 (7th Cir. 1993) ("A rule simply clarifying an unsettled or confusing area of the law. . . does not change the law, but restates what the law according to the agency is and has always been: 'It is no more retroactive in its operation than is a judicial determination construing and applying a statute to a case in hand.'" (quoting *Manhattan Gen. Equip. Co. v. Comm'r*, 297 U.S. 129, 135 (1936))), *overruled on other grounds by Johnson v. Apfel*, 189 F.3d 561, 563 (7th Cir. 1999); *Cookeville Reg'l Med. Ctr. v. Leavitt*, 531 F.3d 844, 849 (D.C. Cir. 2008); *Brown v. Thompson*, 374 F.3d 253, 258-61 & n.6 (4th Cir. 2004); *ABKCO Music, Inc. v. LaVere*, 217 F.3d 684, 689-91 (9th Cir. 2000); *Orr v. Hawk*, 156 F.3d 651, 654 (6th Cir. 1998); *Liquilux Gas Corp. v. Martin Gas Sales*, 979 F.2d 887, 890 (1st Cir. 1992). *But see Princess Cruises, Inc. v. United States*, 397 F.3d 1358, 1363 (Fed. Cir. 2005).

In determining whether a new regulation merely "clarifies" the existing law, "[t]here is no bright-line test" to

35

guide us. *Marmolejos*, 140 F.3d at 491.[9] After reviewing the relevant case law from our Court and other courts of appeals, however, we think that four factors are particularly important for making this determination: (1) whether the text of the old regulation was ambiguous, *see, e.g.*, *ABKCO Music, Inc.*, 217 F.3d at 691; *Piamba Cortes*, 177 F.3d at 1283-84; (2) whether the new regulation resolved, or at least attempted to resolve, that ambiguity, *see, e.g.*, *Marmolejos*, 140 F.3d at 491; *Liquilux Gas Corp.*, 979 F.2d at 890; (3) whether the new regulation's resolution of the ambiguity is consistent with the text of the old regulation, *see, e.g.*, *Marmolejos*, 140 F.3d at 491; *Boddie v. Am. Broad. Cos.*, 881 F.2d 267, 269 (6th Cir. 1989); and

---

[9] *Marmolejos* and a number of other Third Circuit cases that we discuss in this section involve amendments to the Sentencing Guidelines or its commentary made after the defendant had already been sentenced. Generally, a defendant's sentence is to be based on the version of the advisory Guidelines and commentary in effect at the time of sentencing. U.S.S.G. § 1B1.11(a). However, unless an Ex Post Facto Clause violation would result, "a post-sentencing amendment . . . should be given effect" — and the defendant's sentence adjusted accordingly — "if it '*clarifies*' the guideline or comment in place at the time of sentencing." *Marmolejos*, 140 F.3d at 490 (emphasis added). Because the ultimate inquiry is the same, we think our statements as to when an amendment to the Guidelines or its commentary is "clarifying" are equally applicable to the determination of whether an amendment to a statute or regulation is "clarifying."

(4) whether the new regulation's resolution of the ambiguity is consistent with the agency's prior treatment of the issue, *see, e.g.*, *First Nat'l Bank of Chi. v. Standard Bank & Trust*, 172 F.3d 472, 479 (7th Cir. 1999); *Orr*, 156 F.3d at 654.[10]

Before turning to the application of these four factors to the case before us, we note that there are two other factors on which some courts of appeals rely that we do not find to be all that significant. First, we do not consider an enacting body's description of an amendment as a "clarification" of the pre-amendment law to necessarily be relevant to the judicial analysis. *United States v. Diaz*, 245 F.3d 294, 304 (3d Cir.

---

[10] Levy devotes a number of pages in his briefs to the argument that the new Rules may not be applied to the 1999 reclassification because they are "legislative," as opposed to "interpretive." This distinction, however, does not advance his cause. The significance of a rule's classification as "legislative" is that an agency must promulgate it through the use of the formal notice-and-comment rulemaking procedures contained in the Administrative Procedure Act ("APA"). *Chao v. Rothermel*, 327 F.3d 223, 227 (3d Cir. 2003). Although the inquiries may hinge on some of the same factors, the legislative-interpretive dichotomy has no bearing on whether a rule has an impermissible retroactive effect. Similarly, in response to another of Levy's contentions, we note that an agency's decision to use the APA's formal rulemaking procedures to promulgate a rule does not affect whether that rule may be applied to pre-promulgation conduct.

37

2001); *Marmolejos*, 140 F.3d at 493. *But see Heimmerman v. First Union Mortgage Corp.*, 305 F.3d, 1257, 1260 (11th Cir. 2002); *First Nat'l Bank*, 172 F.3d at 478. Second, we do not take the fact that an amendment conflicts with a judicial interpretation of the pre-amendment law to mean that the amendment is a substantive change and not just a clarification. *Marmolejos*, 140 F.3d at 492-93. As we explained in *Marmolejos*, "one could posit that quite the opposite was the case — that the new language was fashioned to clarify the ambiguity made apparent by the caselaw." *Id.* at 492.[11] *But see Nat'l Mining Ass'n v. Dep't of Labor*, 292 F.3d 849, 860 (D.C.

---

[11] There are Guideline amendment cases in which we have made statements to the contrary, suggesting that a conflict with a prior judicial interpretation does make an amendment substantive, as opposed to clarifying. But these cases are distinguishable. In *United States v. Brennan*, 326 F.3d 176, 197-98 (3d Cir. 2003), *Diaz*, 245 F.3d at 303, and *United States v. Bertoli*, 40 F.3d 1384, 1405-07 (3d Cir. 1994), applying the new amendment would have resulted in a greater sentence for the defendant and thus would have implicated the Ex Post Facto Clause. As we explicitly indicated in *Marmolejos*, when ex post facto issues are involved, the rules of the game are different. 140 F.3d at 492 n.6. In *United States v. Roberson*, 194 F.3d 408, 417-18 (3d Cir. 1999), there was no pre-existing ambiguity in the Guidelines section at issue. The Sentencing Commission's amendment to the commentary conflicted not only with a prior judicial construction, but also with the plain meaning, of the relevant provision. *Id.*

38

Cir. 2002); *United States v. Capers*, 61 F.3d 1100, 1110 (4th Cir. 1995).

Focusing first on Rule 16b-3, we think that all four factors identified above point to the conclusion that the new Rule is a clarification of the previous version and that, thus, applying it to the 1999 reclassification would have no impermissible retroactive effect. First, we already determined in *Levy I* that old Rule 16b-3(d)'s reference to "[a]ny transaction involving a grant, award or other acquisition from the issuer" was ambiguous. As discussed above, we thought it unclear from the text of the Rule whether "other acquisition" referred truly to *any* other acquisition or, instead, only to those acquisitions that, like grants and awards, involve compensation. *Levy I*, 314 F.3d at 121-22.[12] Second, new Rule 16b-3 resolved this ambiguity,

---

[12] Levy contends that "other acquisition" in the phrase "grant, award or other acquisition from the issuer" unambiguously referred only to transactions with a compensatory nexus because "grants" and "awards" both involve compensation. As support, he invokes the interpretive canon *ejusdem generis*, under which "where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 114-15 (2001) (internal quotation marks omitted). But while this may be one way to approach the language, it is not the only way. *See Chicakasaw Nation v. United States*, 534 U.S. 84, 94 (2001) ("[C]anons [of interpretation] are not

explicitly providing that the Rule's exemption is available "whether or not [the transaction at issue was] intended for a compensatory or other particular purpose." 17 C.F.R. § 240.16b-3(d). Third, the new Rule's resolution of the ambiguity is consistent with the text of the old Rule, which made no mention of a compensatory nexus requirement. Finally, the new Rule's resolution of the ambiguity is not at odds with the SEC's earlier-expressed understanding of the old Rule. To the contrary, as noted above, the SEC stated in the release it issued upon adopting the old Rule that "a transaction need not be pursuant to an employee benefit plan or any compensatory program to be exempt, nor need it specifically have a compensatory element." 1996 Rule 16b-3 Release, 61 Fed. Reg. at 30,379. Levy points to a number of SEC statements that suggest that, in promulgating old Rule 16b-3(d), the agency was primarily concerned with transactions pursuant to employee benefit plans; however, these statements do not conflict with the position that the old Rule *also* applied to transactions with no compensatory nexus whatsoever.[13]

---

mandatory rules. They are guides that 'need not be conclusive.'" (quoting *Circuit City Stores, Inc.*, 532 U.S. at 115)).

[13] Levy also maintains that by including subsection (f), which provided that certain "discretionary transactions" involving employee benefit plans required a six-month waiting period in order to be exempt, the SEC somehow implicitly conveyed the

While the District Court chose to address the retroactivity implications of new Rule 16b-7 as well, we decline to do so. We have already determined that new Rule 16b-3(d) is a valid exercise of the SEC's authority, whose application to the 1999 reclassification would not give rise to any retroactivity concerns. Because this is a sufficient independent ground for affirming the District Court's disposition of the case, we express no opinion as to whether new Rule 16b-7 merely clarifies the old Rule or, relatedly, whether applying it here would have an impermissible retroactive effect.

---

view that old Rule 16b-3(d) required a compensatory nexus. Specifically, he contends that it would have been irrational for the SEC not to exempt these discretionary transactions but to exempt purely volitional, non-compensation-related transactions, given that the latter arguably present greater opportunity for speculative abuse. Although Levy's argument may raise questions as to the wisdom of a particular regulatory scheme, we do not think that the SEC's inclusion of subsection (f) equated to a statement from the SEC that only transactions involving compensation fell within the scope of old Rule 16b-3(d).

## IV.

In light of the foregoing, we will AFFIRM the District Court's grant of summary judgment to National and Sterling and its denial of summary judgment to Levy. Further, to the extent it is inconsistent with our opinion today, we OVERRULE *Levy I*.