# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
September 8, 2014

Lyle W. Cayce
Clerk

No. 12-51228

EXELON WIND 1, L.L.C., formerly known as JD Wind 1, L.L.C.; EXELON WIND 2, L.L.C., formerly known as JD Wind 2, L.L.C.; EXELON WIND 3, L.L.C., formerly known as JD Wind 3, L.L.C.; EXELON WIND 4, L.L.C., formerly known as JD Wind 4, L.L.C.; EXELON WIND 5, L.L.C., formerly known as JD Wind 5, L.L.C.; EXELON WIND 6, L.L.C., formerly known as JD Wind 6, L.L.C.,

                                        Plaintiffs - Appellees,

v.

DONNA L. NELSON, in her official capacity as Chairman of the Public Utility Commission of Texas; KENNETH W. ANDERSON, JR., in his official capacity as Commissioner of the Public Utility Commission of Texas; ROLANDO PABLOS, in his official capacity as Commissioner of the Public Utility Commission of Texas,

                                        Defendants - Appellants,

SOUTHWESTERN PUBLIC SERVICE COMPANY; OCCIDENTAL PERMIAN, LIMITED,

                                        Intervenors - Appellants.

Appeals from the United States District Court
for the Western District of Texas

Before SMITH, PRADO, and ELROD, Circuit Judges.

JENNIFER WALKER ELROD, Circuit Judge:

No. 12-51228

This appeal addresses the Texas Public Utilities Commission's (PUC) interpretation and implementation of a federal statutory and regulatory scheme governing the purchase of energy between public utilities and certain energy production facilities known as Qualifying Facilities. Appellees are qualifying wind generation facilities collectively known as Exelon that challenged a state rule and order which prohibited Exelon from forming Legally Enforceable Obligations when selling power. The district court determined that it had jurisdiction to hear Exelon's claims and then granted summary judgment to Exelon. We disagree. We VACATE the portion of the judgment regarding Exelon's challenge to the PUC's order and direct the district court to dismiss for want of subject matter jurisdiction. As to the remaining claims challenging the PUC's rule, we REVERSE and REMAND because the PUC acted within its discretion and properly implemented the federal regulation at issue here.

I.

Congress enacted the Public Utilities Regulatory Policies Act of 1978 (PURPA) to reduce the dependence of electric utilities on foreign oil and natural gas and to control consumer costs. Congress sought to do so in part by encouraging development of alternative energy sources. *See FERC v. Mississippi*, 456 U.S. 742, 745 (1982); *Power Res. Grp. v. Pub. Util. Comm'n*, 422 F.3d 231, 233 (5th Cir. 2005) [hereinafter *Power Resource III*].[1] PURPA directs the Federal Energy Regulatory Commission (FERC) to promulgate regulations

---

[1] Power Resource Group filed one action under PURPA in Texas state court, and one in federal district court. Power Resource Group subsequently appealed the federal district court decision. Each of these actions is relevant to our discussion in this case. In order to avoid confusion, we refer to the state court decision as *Power Resource I*, the district court decision as *Power Resource II*, and the subsequent decision by this court on appeal as *Power Resource III*.

2

No. 12-51228

to promote energy purchases from cogeneration and small power production facilities, including renewable energy providers such as wind and solar generators. These energy providers are known as Qualifying Facilities. *See* 16 U.S.C. §§ 796(17), 824a-3(a); 18 C.F.R. §§ 292.101(b)(1), 292.203. While Congress sought to promote energy generation by Qualifying Facilities, it did not intend to do so at the expense of the American consumer. PURPA thus strikes a balance between these two interests. For example, PURPA requires utilities to purchase power generated by Qualifying Facilities, but also mandates that the rates that utilities pay for such power "shall be just and reasonable to the electric consumers of the electric utility and in the public interest." 16 U.S.C. § 824a-3(a)(2), (b)(1).

"State regulatory agencies, such as the PUC, are directed to adopt rules which comply with FERC's regulations and implement PURPA." *Power Resource III*, 422 F.3d at 233 (citing 16 U.S.C. § 824a-3(f)). In other words, PURPA orders the states to implement a federal law. This unusual mandate differs from many other statutory regimes, where the states are given the option to either implement the federal law themselves or else have the federal government directly enforce the law. *See New York v. United States*, 505 U.S. 144, 167–68 (1992) (citing the Clean Water Act, Occupational Safety and Health Act, and Resource Conversation and Recovery Act and explaining that "where Congress has the authority to regulate private activity under the Commerce Clause, we have recognized Congress' power to offer States the choice of regulating that activity according to federal standards or having state law pre-empted by federal regulation").

No. 12-51228

As the Supreme Court has noted, the mandatory nature of PURPA's directive to states raises "troublesome" Tenth Amendment concerns. *FERC v. Mississippi*, 456 U.S. at 759. In *FERC v. Mississippi*, the Supreme Court was able to avoid those concerns by explaining that FERC's regulations allow the states to implement PURPA simply by adjudicating disputes arising under the statute. *Id.* at 760. The Supreme Court found PURPA acceptable because it does not *require* states to pass regulations implementing FERC's regulations; instead, states have the option of "resolving disputes on a case-by-case basis" by opening up their courts to adjudicate such claims. *Id.* at 751, 760. Texas has opted to have the PUC implement FERC's regulations through rulemaking, rather than case-by-case adjudication.[2]

FERC provides state regulatory authorities like the PUC "great latitude in determining the manner of implementation of the Commission's rules, provided that the manner chosen is reasonably designed to implement the requirements" of FERC regulations. *See* Regulations Implementing Section 210 of the Public Utility Regulatory Policies Act of 1978, 45 Fed. Reg. 12214, 12230–31 (Feb. 25, 1980). At issue here is one of the rules that the PUC promulgated to implement a FERC regulation.

This FERC regulation provides Qualifying Facilities with two ways to sell power to utilities. *See* 18 C.F.R. § 292.304(d) (FERC's Regulation). Under subsection (d)(1) of FERC's Regulation, a Qualifying Facility may only provide power to the utility on an "as-available" basis, and must price the power at the

---

[2] The PUC was created in 1975 when the Texas Legislature enacted the Public Utility Regulatory Act (PURA). The PUC regulates the state's electric and telecommunication utilities, implements respective legislation, and offers customer assistance in resolving consumer complaints.

No. 12-51228

"time of delivery." *Id.* § 292.304(d)(1).  Immediately following (d)(1) is another subsection of FERC's Regulation, which allows a Qualifying Facility to sell its power pursuant to a Legally Enforceable Obligation.  *Id.* § 292.304(d)(2).  A Qualifying Facility that chooses to sell through a Legally Enforceable Obligation has two options for how it prices its power: It may calculate the price at the moment of delivery, just as under subsection (d)(1), or it may choose to fix the price "at the time the obligation is incurred."  *Id.*  In other words, Qualifying Facilities that form Legally Enforceable Obligations are able to select between the current (as-available) and past (time of obligation) market prices for power.

The PUC's rule implementing FERC's Regulation permits only a Qualifying Facility that generates "firm power" to enter into a Legally Enforceable Obligation.  16 Tex. Admin. Code § 25.242(c) (PUC Rule 25.242).  The PUC defines "firm power" as "power or power-producing capacity [from a Qualifying Facility] that is available pursuant to a legally enforceable obligation for scheduled availability over a specified term."  *Id.* § 25.242(c)(5).  The PUC defines non-firm power from a Qualifying Facility as "[p]ower provided under an arrangement that does not guarantee scheduled availability, but instead provides for delivery as available."  *Id.* § 25.242(c)(9).  In other words, only those Qualifying Facilities able to forecast when they will deliver energy to the utility—and capable of delivering the specified amount of energy at the scheduled time—are eligible to take advantage of the pricing options in subsection (d)(2) of FERC's Regulation.  By contrast, Qualifying Facilities with non-firm power that cannot guarantee such delivery may charge the utility only the current or "as-available" market price for the power.

No. 12-51228

Exelon is a Qualifying Facility, but cannot supply firm power, due in part to the nature of wind generation. Wind is a notoriously fickle energy source, as it blows intermittently and the power it generates is difficult to store.[3] Technological advancements have made it possible for some wind farms to provide more consistent service, but Exelon lacks such technology, and the winds in the Texas Panhandle, where Exelon's facilities are located, do not blow in a predictable pattern. Because it is subject to the whims of these winds, Exelon cannot guarantee that a particular amount of energy will be available at a particular time.

Southwestern Public Service Company (Southwestern) is a utility company that is required under PURPA to buy all of Exelon's wind-generated energy. *See* 16 U.S.C. § 8241-3(a)(3). At various times in 2005 and 2006, Exelon sent letters to Southwestern demanding that Southwestern purchase Exelon's energy output

---

[3] A number of commentators have noted that the intermittent nature of wind supply remains one of the major obstacles to producing wind-generated power. As one report explained:

> Wind generation has technical characteristics which inherently differ from those of conventional generation facilities. Conventional generation can be controlled, or 'dispatched' to a precise output level. The primary energy source for wind generation, however, is inherently variable and incompletely predictable. Thus, electrical output of wind generation plants cannot be dispatched.

Drew Thornley, *Texas Wind Energy: Past, Present, and Future*, 4 Envt'l. & Energy L. & Pol'y J. 69, 76–77 (2009) (quoting Gen. Elect. Energy, Analysis of Wind Generation Impact on ERCOT Ancillary Requirements 7 (2008)); *see also* John Shelton, *Who, What, How, & Wind: The Texas Energy Market's Future Relationship with Wind Energy and Whether It Will Be Enough to Meet the State's Needs*, 11 Tex. Tech Admin. L.J. 401, 408–09 (2010) (explaining that "the wind blows intermittently, and therefore the wind delivers energy intermittently as well"); Governor's Competitiveness Council, 2008 Texas State Energy Plan 16, 28 (2008) (same); Thornley, *supra* at 76 ("Largely because of its intermittent nature, wind is not a baseload resource; thus, it cannot meet a large portion of energy demand.").

## No. 12-51228

for the next twenty years, and purported to create Legally Enforceable Obligations with Southwestern. Exelon further demanded that Southwestern pay Exelon amounts that ranged from approximately $0.035 per kilowatt-hour to more than $0.090 per kilowatt-hour for the first nine years of that twenty-year term. Southwestern refused to accept Exelon's terms. According to Southwestern, these rates were much higher than the as-available prices offered by other generators. Southwestern asserted that Exelon could not form a Legally Enforceable Obligation under subsection (d)(2) because it could not provide firm power. As a result, Southwestern argued that Exelon could not charge more than the as-available prices allowed under subsection (d)(1).

In June 2007, Exelon filed a complaint with the PUC alleging that it had formed a Legally Enforceable Obligation with Southwestern, and that Southwestern was underpaying for its power. Exelon's complaint did not challenge PUC Rule 25.242 or any other Texas rule implementing FERC's regulations under PURPA. Instead, Exelon argued in the PUC proceeding that its power was firm because Exelon promised to sell all of the power it produced to Southwestern. Exelon's case was first heard by an administrative law judge at the PUC. The administrative law judge determined that Exelon's power was non-firm, that it had not created a Legally Enforceable Obligation, and that it was not entitled to additional compensation.[4]

The PUC Commission issued an order (PUC Order) that adopted the

---

[4] The PUC has three commissioners who make final determinations on the PUC's rules and orders. Before the commissioners hear a dispute, it may first be heard by an administrative law judge. The commission retains the power to alter the administrative law judge's findings of fact or conclusions of law before issuing an order. *See* Tex. Gov't Code Ann. § 2003.049(g).

No. 12-51228

administrative law judge's conclusions, with one notable exception. The administrative law judge had proposed including a categorical finding that wind generators could not create Legally Enforceable Obligations because "wind generated power is not readily available." The Commission rejected this proposal. Instead, the Commission concluded that while Exelon was unable to produce firm power, other wind generators may be able to do so and may therefore be capable of forming Legally Enforceable Obligations. The PUC Order noted this conclusion:

> The [administrative law judge] found that wind-generated power is not readily available. The Commission disagrees with this broad statement encompassing all wind-generated power. The Commission notes that disparate wind patterns in the diverse geographic regions of the state can result in significantly different characteristics for wind-generated power. Further combining wind with energy storage techniques or other energy sources, like solar energy, can also result in significant differences.

Exelon appealed the PUC's ruling to the state district court in Travis County, Texas. While the state court appeal was pending, Exelon filed a petition for enforcement and request for declaratory order from FERC, arguing that all Qualifying Facilities are entitled to create Legally Enforceable Obligations, regardless of whether the energy they produce is firm or non-firm. FERC declined to initiate an enforcement action against the PUC, and instead issued an informal declaratory order (FERC's Letter) stating that the PUC Order was inconsistent with FERC's Regulation. FERC's Letter stated that a

No. 12-51228

Qualifying Facility may form a Legally Enforceable Obligation even if its power is non-firm.[5]

Exelon voluntarily non-suited its state court appeal of the PUC Order. In December 2009, Exelon filed this lawsuit in federal district court seeking declaratory and injunctive relief against the PUC Commissioners in their official capacities. In its complaint, Exelon requested that the district court declare that: (1) the PUC Order did not implement FERC's Regulation; (2) all Qualifying Facilities may form Legally Enforceable Obligations; and (3) the PUC must reopen the proceeding brought by Exelon in light of these determinations. Exelon also requested an injunction: (1) requiring the PUC to fully implement FERC's Regulation; (2) prohibiting the PUC from enforcing the PUC Order; and (3) requiring the PUC to address and consider Exelon's petition in light of those declarations.

Southwestern and Southwestern's biggest consumer, Occidental Permian Limited (Occidental), intervened. The PUC, Southwestern, and Occidental

---

[5] FERC's Letter states that FERC's Regulation

> does not contain the words "firm" or "non-firm". . . . This is contrary to the language of the regulation which provides that "[e]ach qualifying facility shall have the option either: to choose the section 292.304(d)(1) method of sale, or the section 292.304(d)(2) method of sale;"

> . . . .

> In conclusion, we find that the Texas Commission's order, limiting the award of a legally enforceable obligation to only those Qualifying Facilities that provide "firm" power, is inconsistent with our regulations implementing PURPA. Under our regulations, [Exelon] Wind has the right to choose to sell pursuant to a legally enforceable obligation, and, in turn, has the right to choose to have rates calculated at avoided costs calculated at the time that obligation is incurred.

*JD Wind 1, LLC*, 129 FERC 61,148 (Nov. 19, 2009).

No. 12-51228

moved to dismiss Exelon's claims under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6), arguing that PURPA grants exclusive jurisdiction to state courts to hear the sort of claims advanced by Exelon. The district court disagreed, and concluded that it had jurisdiction to hear the case.

The parties then moved for summary judgment. The district court issued an order granting Exelon's motion for summary judgment and denying all other motions for summary judgment. The district court concluded that the PUC Order failed to implement PURPA and permanently enjoined the PUC from requiring a Qualifying Facility to provide firm power as a condition of creating a Legally Enforceable Obligation. The district court subsequently amended its judgment to enjoin the PUC Commissioners, rather than the PUC itself. The PUC, Southwestern, and Occidental (collectively, Appellants) appealed.

## II.

We begin by addressing Appellants' argument that there is no subject matter jurisdiction to hear Exelon's claims. We review *de novo* a district court's determination of subject matter jurisdiction. *In re FEMA Trailer Formaldehyde Prods. Liab. Litig. (Miss. Plaintiffs)*, 668 F.3d 281, 286 (5th Cir. 2012). Exelon, as the plaintiff, has the burden of establishing subject matter jurisdiction. *Id.* If we conclude that there is no subject matter jurisdiction, the case must be dismissed. *Home Builders Ass'n, Inc. v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir. 1998).

PURPA provides for two types of review of a state utility regulatory authority's actions: implementation and as-applied challenges. *See Power Resource III*, 422 F.3d at 234–35. Federal courts have exclusive jurisdiction over implementation challenges, while state courts have exclusive jurisdiction over

as-applied challenges.[6]  The type of claims brought by Exelon thus determines whether we have jurisdiction.  *Id.* at 235.  "An implementation claim involves a contention that the state agency . . . has failed to implement a lawful implementation plan under § 824a-3(f) of PURPA, whereas an 'as-applied' claim involves a contention that the state agency's . . . implementation plan is unlawful, as it applies to or affects an individual petitioner."  *Id.* (internal quotation marks and citations omitted); *see also* 16 U.S.C. § 824a-3(g).

The parties disagree as to whether Exelon asserted as-applied or implementation challenges.  Appellants make several arguments for why these were as-applied challenges over which the district court had no jurisdiction.  First, Appellants contend that Exelon is challenging the PUC Order, which only applies to Exelon, rather than PUC Rule 25.242.  Next, Occidental asserts that, although we treated similar claims as implementation challenges in *Power Resource III*, that determination is not binding here.  Finally, the PUC argues that we must read PURPA's jurisdictional grant to federal courts narrowly in order to avoid the "troublesome" Tenth Amendment concerns identified by the Supreme Court in *FERC v. Mississippi*.  We address each of these points in turn.

---

[6] PURPA's "'multi-layered' enforcement provisions" give federal courts exclusive jurisdiction over challenges to a state's implementation of PURPA if two conditions are met: (1) the party bringing the claim must first petition FERC to bring an enforcement action, and (2) after FERC declines to bring such an action, the party may file a complaint which challenges the state regulations as an illegal implementation of PURPA and the FERC regulations. *Power Resource III*, 422 F.3d at 234–35; *see also* 16 U.S.C. § 824a-3(h)(2)(A)–(B). There is no dispute that the first condition is met here.  Exelon petitioned FERC and FERC declined to initiate an enforcement action, although FERC did issue a declaratory order.

No. 12-51228

A.

Appellants argue that Exelon raised as-applied challenges because Exelon only challenged the PUC's application of PUC Rule 25.242 to Exelon. In response, Exelon contends that this was an implementation challenge because the PUC Order had broad effects, and because the PUC Order and PUC Rule 25.242 together fail to implement FERC's Regulation. The district court agreed with Exelon, and characterized Exelon's claims as implementation challenges. The district court first reasoned that Exelon was asserting that it was entitled to form a Legally Enforceable Obligation under FERC's Regulation. The district court explained that, because the PUC Order denied Exelon the right to create a Legally Enforceable Obligation, Exelon was challenging that PUC Order as a failure to implement FERC's Regulation. Second, the district court determined that the PUC Order "implicitly broadened its findings when it explained what other conditions could allow a wind energy facility to succeed in providing firm power" and thus concluded that the PUC Order did not limit its effect only to Exelon. We agree with the district court with respect to only some of Exelon's claims.

i.

To help elucidate the difference between implementation and as-applied challenges, we begin by reviewing our decision in *Power Resource III*, 422 F.3d at 231. There, the PUC had determined that a Qualifying Facility called PRG could not form a Legally Enforceable Obligation because it could not guarantee power delivery within ninety days, as required by PUC Rule 23.66. *Id.* at 234. PRG filed suit in both state and federal court asserting both as-applied and implementation challenges to the PUC's determination. The Texas state courts

No. 12-51228

adjudicated PRG's as-applied claims, including whether the PUC properly interpreted its own rule, and whether that interpretation was preempted by FERC's regulations. *See Power Res. Grp., Inc. v. Pub. Util. Comm'n*, 73 S.W.3d 354, 356–57 (Tex. App.—Austin 2002, pet. denied) [hereinafter *Power Resource I*].

PRG then brought suit in federal district court, where it requested several additional forms of relief, including: (1) a declaration that the PUC had failed to implement the requirements of PURPA; (2) a declaration that the PUC's actions with respect to PRG violated PURPA; and (3) injunctive relief requiring the PUC to implement new Legally Enforceable Obligation regulations, and then requiring the PUC to consider PRG's petition under that new regulatory framework. *See Power Res. Grp. v. Pub. Util. Comm'n*, No. 1:03-CV-762-HLH, Dkt. No. 1, at *12 (W.D. Tex. Oct. 10, 2003) [hereinafter *Power Resource II*]. The district court dismissed all but one of PRG's claims for lack of jurisdiction after determining that they were as-applied challenges:

> PRG again asks this Court to grant relief in the form of an order directing [PUC] to consider PRG's claims under a revised system of regulation . . . . These allegations state an "as applied" claim, which this Court has *no jurisdiction to hear*. . . . [T]he one ultimate and limited issue before the Court at this time is whether [PUC] failed to implement the [Legally Enforceable Obligation] option provided by FERC's regulations.

*Id.* (emphasis in the original). The district court then granted summary judgment to the PUC and other defendants on PRG's implementation claim. We affirmed, without reaching the issue of whether the district court could have also heard PRG's other claims. *Power Resource III*, 422 F.3d at 239.

13

No. 12-51228

ii.

We now turn to Exelon's claims, which fall into two main categories. The majority of Exelon's requests for relief focus on the specific PUC Order, rather than PUC Rule 25.242. For example, Exelon asked the district court for a declaration that the PUC Order did not implement FERC's Regulation and is preempted. These claims challenging the PUC Order are identical to the as-applied claims that the state court of appeals adjudicated in *Power Resource I*, 73 S.W.3d at 361–62. Exelon also asked the district court to declare that the PUC must reopen Exelon's proceedings for further consideration, and to issue an injunction prohibiting the PUC from enforcing the PUC Order. In a thoughtful, well-reasoned opinion, the federal district court in *Power Resource II* dismissed these types of claims for lack of jurisdiction because they were as-applied challenges. *Power Resource II*, No. 1:03-CV-762-HLH, Dkt. No. 44, at 17–18. We agree with the conclusions reached by both the state and federal district courts in *Power Resource I & II* regarding their exclusive jurisdiction under PURPA. Exelon's challenges to the PUC Order are "contention[s] that the state agency's . . . implementation plan is unlawful, as it applies to or affects an individual petitioner" and are thus as-applied challenges over which we have no jurisdiction. *Power Resource III*, 422 F.3d at 235 (internal quotation marks and citations omitted).[7]

The district court in this case reasoned that Exelon's claims challenging

---

[7] This result is supported by other courts that have had occasion to interpret PURPA's jurisdictional grant. *See Occidental Chem. Corp. v. La. Pub. Serv. Comm'n*, 494 F. Supp. 2d 401, 411 (M.D. La. 2007) (applying the reasoning from the federal district court in *Power Resource II*); *Mass. Inst. of Tech. v. Mass. Dep't of Pub. Utils.,* 941 F. Supp. 233, 238 (D. Mass. 1996); *Greensboro Lumber Co. v. Ga. Power Co.*, 643 F. Supp. 1345, 1374 (N.D. Ga. 1986), *aff'd*, 844 F.2d 1538 (11th Cir. 1988).

No. 12-51228

the PUC Order were implementation challenges based on what it considered to be a broad ruling in the PUC Order that prevented all wind generators from forming Legally Enforceable Obligations. We disagree. The PUC explicitly declined to create a categorical rule preventing wind generators from forming Legally Enforceable Obligations and instead issued an order limited to only Exelon's capacity to produce firm power:

> The [administrative law judge] found that wind-generated power is not readily available. The Commission disagrees with this broad statement encompassing all wind-generated power. The Commission notes that disparate wind patterns in the diverse geographic regions of the state can result in significantly different characteristics for wind-generated power. Further combining wind with energy storage techniques or other energy sources, like solar energy, can also result in significant differences.[8]

The PUC thus left open the possibility that other wind generators might be able to comply with the firm power requirement, either through technological advances or based on their locations in regions with more predictable wind

---

[8] Discussion between the PUC Commissioners on the record of the hearing confirms that the PUC Order had a limited scope:

CHAIRMAN SMITHERMAN: Well, I think the problem here is that there's no definition of "not readily available power." So that sort of leads us into a confusing state.

COMM. NELSON: I think we just want to clarify it so that in the future, if somebody came in and could meet that standard that we're not being preclusive.

. . . .

COMM. ANDERSON: Because I could envision in the future wind, for a variety of reasons, could be readily available whether through storage or geographical diversity or mixed with solar.

COMM. NELSON: Right. And it really depends on the area of the state —

COMM. ANDERSON: It really does.

COMM. NELSON: — because, you know, along the coast the pattern is totally different and it blows at peak times.

15

No. 12-51228

patterns than those found around the Exelon facilities. As both the PUC and Occidental aptly note, the fact that as-applied challenges may establish precedent relevant to future cases does not transform them into facial or implementation challenges. Courts routinely adjudicate as-applied constitutional challenges to statutes; these decisions do not become facial challenges simply because of their *stare decisis* effect in future cases presenting similar facts or legal theories. *Cf. In re Cao*, 619 F.3d 410, 430 (5th Cir. 2010) (*en banc*); *see also id.* at 443 (Jones, C.J., concurring in part and dissenting in part). The PUC Order is best viewed as an application of PUC Rule 25.242—which the PUC promulgated more than thirty years ago—to an individual petitioner.[9] As a result, Exelon's challenges to the PUC Order are as-applied challenges.

### iii.

Exelon offers one additional argument for why these claims are implementation challenges. Exelon points to FERC's Letter, which Exelon requested from FERC after receiving an unfavorable ruling from the PUC. While this FERC-issued document is rather impressively called a Declaratory Order, it is actually akin to an informal guidance letter. *See Indus. Cogenerators v. FERC*, 47 F.3d 1231, 1235 (D.C. Cir. 1995) ("The Commission nowhere purported to make the Declaratory Order binding upon the FPSC, nor can we imagine how it could do so. Unlike the declaratory order of a court, which does fix the rights of the parties, this Declaratory Order merely advised the parties

---

[9] The PUC promulgated a predecessor to PUC Rule 25.242 in 1981. There have been several intermediate iterations of the Rule since then, none of which impact the outcome of this case. *See* Act of Apr. 10, 1981, 67th Leg., R.S., ch. 31, § 2, 1981 Tex. Gen. Laws 70, 71 (codified at Tex. Utils. Code Ann. § 35.061).

of the Commission's position."). In this Letter, FERC states that Exelon's claims are implementation challenges. Exelon cites *City of Arlington v. FCC*, 133 S. Ct. 1863, 1872 (2013), and maintains that we should give deference to FERC's characterization, in its Letter, of these claims as an implementation challenge. Exelon argues that, based on this deference, we should conclude that the federal courts have jurisdiction to hear Exelon's claims. The district court here adopted Exelon's position without providing any reasoning or case law in support: "That Exelon is in fact challenging PUC[]'s implementation of PURPA, rather [than] a particular application, is confirmed by the reasoning in the FERC Declaratory Order, and the positions taken by various intervenors before FERC."

We disagree. In *City of Arlington*, the Supreme Court afforded *Chevron* deference to an agency's interpretation of its *own* jurisdiction. *Id.*[10] Indeed, the Supreme Court explicitly noted that it granted *certiorari* "limited to the first question presented: Whether . . . a court should apply *Chevron* to . . . an agency's determination of its own jurisdiction." *Id.* at 1867–68 (internal quotation marks omitted). In contrast, the question here is not whether FERC has jurisdiction to address Exelon's claims, but rather whether these claims belong in a state or a federal court. *City of Arlington* does not address this entirely different

---

[10] The Supreme Court's decision in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, requires courts to conduct a two-step inquiry when determining whether to defer to an agency's interpretation of a statute that it administers. 467 U.S. 837 (1984). Under the first step, we ask "whether Congress has directly spoken to the precise question at issue" or whether the statute is ambiguous. *Id.* at 842–43. If Congress has resolved the question, then the clear intent of Congress binds both the agency and the court. *Id.* Under the second step, if "the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 843. Under this second step, we defer to the agency's interpretation if "it is a reasonable interpretation of the statute." *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009).

proposition advocated by Exelon, and does not support the argument that we should defer to FERC's interpretation of our own jurisdiction under the statutory scheme.

While the Supreme Court has not addressed this novel argument, our own precedent forecloses it. As Judge Wisdom noted long ago, "[t]he courts, however, have to make their own determination whether the district court has jurisdiction, rather than defer to the [federal agency] in the first instance." *Reeb v. Econ. Opportunity Atlanta, Inc.*, 516 F.2d 924, 926 (5th Cir. 1975); *see also Lopez–Elias v. Reno*, 209 F.3d 788, 791 (5th Cir. 2000) (explaining that "the determination of our jurisdiction is exclusively for the court to decide"). More recently, our sister circuit explained that, "the Supreme Court has repeatedly affirmed that federal courts have an independent obligation to determine their own subject-matter jurisdiction." *Shweika v. Dep't of Homeland Sec.*, 723 F.3d 710, 719 (6th Cir. 2013) (citing *Henderson ex rel. Henderson v. Shinseki*, 131 S. Ct. 1197, 1202 (2011); *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006); *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 95 (1998)). "Requiring that a court defer to an agency's interpretation of the court's own subject-matter jurisdiction would interfere with this independent obligation." *Id.*

Even assuming *arguendo* that an agency's interpretation of a court's jurisdiction could warrant deference, FERC's Letter would still not be entitled to *Chevron* deference because it is an informal guidance document. As the Supreme Court has explained, "[i]nterpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant *Chevron*-style deference." *Christensen v. Harris Cnty.*, 529 U.S. 576, 587 (2000).

No. 12-51228

Exelon conceded as much at oral argument, and acknowledged that FERC's Letter is "entitled to respect," but only to the extent that it is persuasive. *Id.* (citing *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)).  Because we find the reasoning in *Power Resource I & II* more persuasive than FERC's Letter, we conclude that Exelon's challenges to the PUC Order are as-applied challenges, over which the district court lacked jurisdiction.

## B.

### i.

Exelon's second category of claims challenges PUC Rule 25.242.  Exelon argues that the Rule does not fully implement FERC's Regulation because PUC Rule 25.242 limits the category of Qualifying Facilities that may form Legally Enforceable Obligations.  In response, Occidental contends that Exelon did not plead a proper implementation challenge because it did not explicitly ask the district court to require the PUC to engage in new rulemaking or to invalidate PUC Rule 25.242.  Exelon did, however, raise a more general challenge to PUC Rule 25.242 by asking for a declaration that all Qualifying Facilities may form Legally Enforceable Obligations, and requesting that the court issue an injunction requiring the PUC to fully implement FERC's regulations.  Either form of relief would necessarily require the PUC to alter its current rules.  We see little difference between these requests for relief and those that we addressed as implementation challenges in *Power Resource III*, 422 F.3d at 237–39.  Exelon's claims challenging PUC Rule 25.242 are thus implementation challenges.

Occidental asserts that our "drive-by" jurisdictional ruling in *Power Resource III* is not entitled to precedential effect.  We disagree.  While "questions

of jurisdiction [that] have been passed on in prior decisions *sub silentio*" are not entitled to preclusive effect, *Power Resource III* is not such a case. *See Hagans v. Lavine*, 415 U.S. 528, 533 n.5 (1974). The district court opinion in *Power Resource II* devoted substantial time to the jurisdictional question. We, in turn, devoted a large portion of our opinion to recounting the district court's jurisdictional determination before reaching the merits of the case. *See Power Resource III*, 422 F.3d at 234–37. The appellant in *Power Resource III* also briefed the issue of whether the district court erred in determining that it lacked jurisdiction to grant relief on PRG's as-applied claims. *Id.* at 239. While our decision in *Power Resource III* certainly could have given more guidance on its jurisdictional determination, the issue was clearly before the court. *Power Resource III* is thus distinguishable from cases where we have held that the jurisdictional determination had no precedential effect because the prior court did not appear to consider the issue. *See, e.g.*, *USPPS, Ltd. v. Avery Dennison Corp.*, 647 F.3d 274, 283 (5th Cir. 2011) ("No one contends that the propriety of jurisdiction in this Circuit was actually argued to the prior panel or that the prior panel's decision actually addresses that question."); *Kershaw v. Shalala*, 9 F.3d 11, 13 n.3 (5th Cir. 1993) ("[T]he jurisdictional issue was neither raised by the parties nor addressed by the Court."). Even assuming *arguendo* that we were not bound by the jurisdictional determination in *Power Resource III*, we would conclude that the delineation drawn by the district court in *Power Resource II* between implementation and as-applied challenges is a persuasive reading of PURPA's text, and would follow the same approach here.

ii.

The PUC insists that we should read PURPA's jurisdictional grant more

No. 12-51228

narrowly, based on the Supreme Court's decision in *FERC v. Mississippi*, 456 U.S. at 759. Under the PUC's view, federal courts only have jurisdiction to hear claims asserting that the PUC has failed to open its doors to adjudicate disputes under PURPA when it is simultaneously hearing similar state lawsuits. While this reading of PURPA's jurisdictional provisions may be possible, it is not compelled by the Supreme Court's decision in *FERC v. Mississippi*, and would conflict with our own prior interpretation of the scope of PURPA's jurisdictional grant. *See Power Resource III*, 422 F.3d at 235–37. Absent a clear contrary statement from the Supreme Court or *en banc* reconsideration, we are bound by our own precedent. *See United States v. Stone*, 306 F.3d 241, 243 (5th Cir. 2002).

Moreover, we do not think that the PUC's approach is necessary to avoid constitutional problems in this case. As the Supreme Court noted in *FERC v. Mississippi*, states have the option of implementing FERC's regulations through state regulations, but may decline to do so if they would prefer to open their state courts only to hear disputes over FERC's regulations. 456 U.S. at 760. As a result, Texas was not *forced* to pass laws implementing FERC's regulations. *Cf. Printz v. United States*, 521 U.S. 898, 933 (1997). Instead, Texas opted to have the PUC promulgate regulations implementing FERC's Regulations. *See* Tex. Utils. Code Ann. § 35.061; *see also* 27 Tex. Reg. 5966, 5968 (2002) ("The commission chooses to continue implementation of PURPA through rulemaking. The commission agrees with Texas [Qualifying Facilities] that implementation on a case-by-case, contested proceeding hearing approach would waste parties' resources."). We thus decline to follow Appellants' approach and adhere instead to the framework we followed in *Power Resource III*, 422 F.3d at 236.

Accordingly, we VACATE the portion of the judgment regarding Exelon's

No. 12-51228

challenge to the PUC's order and direct the district court to dismiss for want of subject matter jurisdiction, and review only Exelon's claims that PUC Rule 25.242 fails to implement FERC's Regulation.

### III.

We now turn to whether the district court properly granted summary judgment in favor of Exelon on its claims that the PUC failed to implement FERC's Regulation. "We review a district court's ruling on a motion for summary judgment *de novo* and apply the same legal standards as the district court." *Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When ruling on a motion for summary judgment, we are required to review all inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986).

We review the PUC's implementation of PURPA and the FERC Regulation with deference because "a state has broad authority to implement PURPA with respect to the approval of purchase contracts between utilities and [Qualifying Facilities]." *Power Resource III*, 422 F.3d at 236 (citations omitted).

PURPA requires states to implement FERC's regulations. *See* 16 U.S.C. § 824a-3(f)(1).[11]  States may implement PURPA "by issuing regulations, by

---

[11] Appellants argue that we should read FERC's Regulation narrowly to avoid Tenth Amendment issues that might arise from forcing Texas to implement certain regulations. As noted in Section II.C.ii, *supra*, this narrow interpretation is not necessary to avoid Tenth Amendment issues here. Texas opted to have the PUC issue rules to enforce PURPA, rather than simply opening its courts to hear PURPA disputes. Having done so, Texas (and the PUC) may not pass regulations that are inconsistent with FERC's regulations. *See Fid. Fed. Sav.*

resolving disputes on a case-by-case basis, or by taking any other action reasonably designed to give effect to FERC's rules." *FERC v. Mississippi*, 456 U.S. at 751. Here, Texas chose to give effect to FERC's rules by promulgating regulations. FERC's Regulation at issue here provides that each Qualifying Facility "shall have the option . . . [t]o provide energy or capacity pursuant to a legally enforceable obligation for the delivery of energy or capacity over a specified term." 18 C.F.R. § 292.304(d). We note at the outset that the plain language of PUC Rule 25.242 does not conflict with FERC's Regulation. Indeed, there is no FERC Regulation or PURPA provision specifically addressing whether non-firm energy providers may form Legally Enforceable Obligations. Exelon claims instead that the PUC failed to implement FERC's Regulation because PUC Rule 25.242 limits the class of Qualifying Facilities that have the option of forming Legally Enforceable Obligations.[12] Because Congress has left this determination to the PUC, rather than FERC, we disagree.

In determining whether PUC Rule 25.242 fails to implement FERC's

---

*& Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982) ("Even where Congress has not completely displaced state regulation in a specific area, state law is nullified to the extent that it actually conflicts with federal law."). *Cf. New York*, 505 U.S. at 166–67; *Nat'l Collegiate Athletic Ass'n v. Governor of N.J.,* 730 F.3d 208, 228 (3d Cir. 2013), *cert. denied*, 2014 U.S. LEXIS 4343, *and cert. denied*, 2014 U.S. LEXIS 4345, *and cert. denied*, 2014 U.S. LEXIS 4346 (June 23, 2014).

[12] The PUC's regulations provide the following definitions:
(5) Firm power—From a qualifying facility, power or power-producing capacity that is available pursuant to a legally enforceable obligation for scheduled availability over a specified term.
. . . .
(9) Non-firm power from a qualifying facility—Power provided under an arrangement that does not guarantee scheduled availability, but instead provides for delivery as available.

16 Tex. Admin. Code § 25.242(c)(5), (9).

No. 12-51228

Regulation, we turn once again to our binding precedent in *Power Resource III*, 422 F.3d at 237–39.  The dissenting opinion's view of this case apparently flows from the view that we are not bound by *Power Resource III* here.  We disagree, and explain below why that case forecloses the position taken in the dissenting opinion.

A.

In *Power Resource III*, we upheld the PUC's determination that PRG—which was also a Qualifying Facility—could not form a Legally Enforceable Obligation because it could not guarantee power delivery within ninety days as required by the PUC's 90-day Rule.  *Id.* at 234.  PRG—like Exelon—argued that the PUC's 90-day Rule did not meaningfully implement the same FERC Regulation at issue here because the PUC's 90-day Rule "eviscerate[d]" the Legally Enforceable Obligation option for an entire category of Qualifying Facilities that were unable to meet the rule's requirements.  *Id.* at 238.  We disagreed, and upheld the PUC's 90-day Rule, explaining that,

> PRG has failed to show that PURPA and the FERC regulations mandate that all [Qualifying Facilities], including unbuilt ones, must be able to create a [Legally Enforceable Obligation] at any time. . . . FERC regulations grant the states discretion in setting specific parameters for [Legally Enforceable Obligations].
> . . . .
>
> If FERC had determined it necessary to set more specific guidelines concerning [Legally Enforceable Obligations], it could have done so. . . . The plain text of the FERC regulation, however, fails to mandate that requirement.  Rather, *defining the parameters for creating a [Legally Enforceable Obligation] is left to the states and their regulatory agencies*.

*Id.* at 238–39 (emphasis added).  *Power Resource III* thus forecloses the dissenting opinion's  first argument, that under the plain language of FERC's

No. 12-51228

Regulation, all Qualified Facilities must *always* be allowed to enter into Legally Enforceable Obligations. Instead, *Power Resource III* held that state regulatory agencies—rather than FERC—were empowered to define the parameters of the circumstances in which Qualified Facilities could form Legally Enforceable Obligations. *Id.* It is this essential holding which binds us here: under the cooperative federalism scheme created by PURPA, it is the PUC, rather than FERC, that defines the parameters for when a Qualified Facility may form a Legally Enforceable Obligation.

The same holds true here. The PUC had the discretion to determine the specific parameters for when a wind farm can form a Legally Enforceable Obligation, and through regulation determined that only when a wind farm can provide firm power may it enter into a Legally Enforceable Obligation. This does not, as the dissenting opinion fears, prevent *all* wind farms from *ever* forming Legally Enforceable Obligations. To the contrary: As we noted in our jurisdictional analysis, the PUC explicitly left open the possibility that other wind farms might be able to provide firm power, and thus form Legally Enforceable Obligations. Even Exelon is not, as the dissenting opinion claims, "ineligible" to form a Legally Enforceable Obligation. If Exelon is able to demonstrate that it can provide firm power, either through modification or through advances in technology, then it too may enter into Legally Enforceable Obligations.[13] *Cf.* Matthew L. Wald, *Texas Is Wired for Wind Power, and More*

---

[13] Nor did our holding in *Power Resource III* depend, as the dissenting opinion suggests, on the fact that a state regulatory agency is entitled to deference only when FERC is silent on the issue. Rather, it was based on a recognition of the careful balance of authority between the federal and state authority that Congress drew when it implemented PURPA. The dissenting opinion's contrary interpretation would undermine this balance by giving FERC the final say over decisions delegated to state regulatory agencies. Such a shift in power might

No. 12-51228

*Farms Plug In*, N.Y. Times, July 24, 2014, at B1 (noting improvements in transmission infrastructure for Texas wind farms).

Here, just as in *Power Resource III*, the mere fact that PUC Rule 25.242 prevents some Qualifying Facilities from entering into Legally Enforceable Obligations at certain times does not mean that the PUC failed to implement FERC's Regulation. As we said in *Power Resource III*, "[t]he plain text of the FERC regulation . . . fails to mandate" that all Qualifying Facilities be allowed to form Legally Enforceable Obligations. *Id.* at 239. To determine otherwise here would put us in conflict with our own controlling precedent in *Power Resource III*.

### B.

Exelon maintains that we should instead defer to FERC's Letter, which determined that PUC Rule 25.242 failed to implement, and was inconsistent with, FERC's Regulation. Specifically, FERC interpreted its Regulation to allow all Qualifying Facilities—even those that produce non-firm power—to form Legally Enforceable Obligations. Exelon conceded at oral argument that FERC's Letter is not entitled to deference under either *Chevron* or *Auer v. Robbins*, 519 U.S. 452, 457 (1997).[14] Instead, Exelon argues that we ought to give weight to FERC's informal determination based on its persuasive value. We disagree for

---

raise the sort of "troublesome" Tenth Amendment concerns expressed by the Supreme Court in *FERC v. Mississippi*, 456 U.S. at 759. The dissenting opinion does not address the serious constitutional concerns that could flow from its approach, and we are hesitant to wade unnecessarily into such murky waters. We therefore reject the dissenting opinion's interpretation of *Power Resource III*.

[14] In *Auer* the Supreme Court applied the same two-step analysis from *Chevron* and explained that agency interpretations of their own regulations are entitled to even greater deference. 519 U.S. at 457.

several reasons.

We begin by noting that FERC is not a party to this litigation, and did not take a position on this question of interpretation before our court. FERC's involvement in this case has been limited to sending Exelon a single letter that supports the position that Exelon has taken in this case. We cannot defer to Exelon's proffered interpretation of the FERC Regulation, because it is foreclosed by our own reading of the Regulation in *Power Resource III*.[15]

Even if Exelon had not conceded that FERC's Letter was entitled to no deference under *Chevron* and *Auer*, a court's prior construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference when the prior court decision held that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion. *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005).[16]

*Power Resource III* makes clear that our prior reading of FERC's Regulation unambiguously forecloses the interpretation offered by Exelon here:

---

[15] The dissenting opinion argues that even though Exelon conceded that FERC's Letter advocating this interpretation was not entitled to deference under *Chevron* and *Auer*, we should still defer. In support of this conclusion, the dissenting opinion relies on a dissent from an *en banc* opinion of this court, *Castellanos–Contreras v. Decatur Hotels, LLC*, 622 F.3d 393, 397 (5th Cir. 2010) (*en banc*), and our decision in *Elgin Nursing & Rehabilitation Center v. U.S. Dep't of Health & Human Servs.*, 718 F.3d 488, 492 (5th Cir. 2013). A dissenting opinion is, of course, not binding. *Elgin* did not address the issue of whether a party may *concede* that an interpretation is not entitled to deference. Instead, the court in *Elgin* gave an interpretation the proper level of deference when the two parties disagreed on the appropriate level of deference. 718 F.3d at 492. We therefore see no reason why we should not accept Exelon's concession here.

[16] While the Supreme Court's decision in *Brand X* specifically addressed *Chevron* deference, our sister circuits have applied this same framework when interpreting regulations. *See, e.g.*, *Levy v. Sterling Holding Co., LLC*, 544 F.3d 493, 502 (3d Cir. 2008) ("We see no reason why these principles should not apply equally to the interpretation of a regulation.").

No. 12-51228

> If FERC had determined it necessary to set more specific guidelines concerning [Legally Enforceable Obligations], it could have done so. For example, the FERC regulations could have mandated that the [Qualifying Facilities] must be able to lock in purchase rates with a [Legally Enforceable Obligation] prior to construction of a facility. The *plain text of the FERC regulation*, however, fails to mandate that requirement. Rather, *defining the parameters for creating a [Legally Enforceable Obligation] is left to the states and their regulatory agencies.*

*Power Resource III*, 422 F.3d at 239 (emphasis added).

Our approach does not, as the dissenting opinion argues, "flip[] *Brand X* on its head." Dissent at 21. Rather, it is a straight-forward application of the doctrine, which is consistent with the way in which this court and our sister circuits have applied the decision. *See Burks v. United States*, 633 F.3d 347, 360 (5th Cir. 2011); *Tran v. Mukasey*, 515 F.3d 478, 484 (5th Cir. 2008)*; Sierra Club v. Envt'l Prot. Agency*, 479 F.3d 875, 880–84 (D.C. Cir. 2007) (vacating an EPA rule that conflicted with circuit precedent and explaining that the EPA "must obey the Clean Air Act as written by Congress and interpreted by this court").

Our decision is also consistent with the approach used in cases where our sister circuits have previously interpreted statutes and regulations to be ambiguous, and thus deferred to the agency's interpretation following the Supreme Court's ruling in *Brand X*, 545 U.S. 967. In those cases, the courts emphasize that their prior decisions also noted ambiguity in the text at issue. *See, e.g., Garfias–Rodriguez v. Holder*, 702 F.3d 504, 512 (9th Cir. 2012) ("We wrote in *Acosta* that '[t]he statutes involved do not clearly indicate whether the inadmissibility provision or the penalty-fee adjustment of status provision should take precedence,' and reached our conclusion by relying heavily on our earlier *Perez–Gonzalez* decision."); *Hernandez–Carrera v. Carlson*, 547 F.3d

1237, 1245 (10th Cir. 2008) ("The Supreme Court has twice explicitly found the statute to be ambiguous."); *Fernandez v. Keisler*, 502 F.3d 337, 347–48 (4th Cir. 2007) ("We thus do not hold that a court must say in so many magic words that its holding is the only permissible interpretation of the statute in order for that holding to be binding on an agency. In many instances, courts were operating without the guidance of *Brand X*, and yet the exercise of statutory interpretation makes clear the court's view that the plain language of the statute was controlling and that there existed no room for contrary agency interpretation."); *Dominion Energy Brayton Point, LLC v. Johnson*, 443 F.3d 12, 17 (1st Cir. 2006) ("The short of it is that the *Seacoast* court, faced with an opaque statute, settled upon what it sensibly thought was the best construction of the Clean Water Act's 'public hearing' language."); *Levy v. Sterling Holding Co., LLC*, 544 F.3d 493, 503 (3d Cir. 2008) (explaining that in the prior case "we struggled to divine their applicability to the instant fact pattern. . . . [and] repeatedly noted the lack of clear guidance in the text or elsewhere regarding whether and to what extent reclassifications fell within the Rule's scope"); *see also* Note, *Implementing Brand X: What Counts as a Step One Holding?*, 119 Harv. L. Rev. 1532, 1538 (2006) (discussing the possible ways to implement *Brand X*). In contrast to these cases, in *Power Resource III* we determined that the "plain text" of FERC's Regulation allowed the PUC to limit the situations in which Qualifying Facilities can form Legally Enforceable Obligations. Thus, under *Brand X*, the interpretation put forward by Exelon would not be entitled to deference even if counsel had not conceded this point at oral argument.

Even assuming *arguendo* that this prior interpretation left room for discretion, an agency is not entitled to deference when it offers up an

No. 12-51228

interpretation of the Regulation that we have already said to be unambiguously foreclosed by the regulatory text. *See Christensen*, 529 U.S. at 588 ("*Auer* deference is warranted only when the language of the regulation is ambiguous."). This court has already determined that FERC's Regulation unambiguously "left [it] to the states and their regulatory agencies" to "defin[e] the parameters for creating a Legally Enforceable Obligation." *Power Resource III*, 422 F.3d at 239. We therefore accord no deference to the interpretation in FERC's Letter.

Contrary to the dissenting opinion's claim, we are not substituting our own reading of the regulation for FERC's here. Nor are we deferring "based on nothing more than the state regulatory authority's say-so." Dissent at 1. Instead, we are deferring to the PUC's official interpretation of the Regulation *in a promulgated state regulation* because our precedent requires us to defer to the PUC on this particular issue, and prevents us from deferring to Exelon's proffered interpretation. Like FERC, the PUC too has a great deal of expertise. Indeed, Texas is rather unique in that it runs its own electric grid. Even if that were not the case, Congress delegated the authority to make this call to the PUC.

## C.

The reading advocated by Exelon would also render PURPA subsection (d)(1) superfluous.[17] Subsection (d)(1) of FERC's Regulation allows a Qualifying Facility to provide power to the utility only on an as-available basis, and

---

[17] Here, Exelon has not given an adequate explanation for what independent role (d)(1) could play under its interpretation of the Regulation. Only the dissenting opinion offers *some* explanation of what role (d)(1) might serve under Exelon's interpretation. We cannot determine that a provision is *not* rendered superfluous by a party's reading simply because there may be some theoretical situation, not identified or even articulated by either party, that would give it effect.

requires the Qualifying Facility to price the power at the moment of delivery. *Id.* § 292.304(d)(1). Subsection (d)(2) gives a Qualifying Facility this *exact same option* to sell power to the utility on an as-available basis, and also provides a Qualifying Facility with a second option to choose to fix the price "at the time the obligation is incurred."

Under the reading advocated by Exelon and adopted by the district court, every Qualifying Facility must have the option to form a Legally Enforceable Obligation, and thus to select between the two pricing options available under subsection (d)(2). If every Qualifying Facility may take advantage of the choice provided by subsection (d)(2), it is hard to understand why Congress or FERC would also include a separate subsection limiting Qualifying Facilities to one pricing option. Exelon's "reading is thus at odds with one of the most basic interpretive canons, that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009) (internal quotation marks and brackets omitted). When presented with two plausible readings of a regulatory text, this court common-sensically follows the same principle and prefers the reading that does not render portions of that text superfluous. *See Nat'l Ass'n of Home Builders*, 551 U.S. at 668 ("But this reading would render the regulation entirely superfluous."); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 174 (2012) ("If possible, every word and every provision is to be given effect (*verba cum effectu sunt accipienda*). None should be ignored. None should needlessly be given an interpretation that causes it to duplicate another provision or to have no consequence." (footnote omitted)).

No. 12-51228

In contrast, the PUC's reading of the provisions gives effect to both subsections: Only if a Qualifying Facility can guarantee a particular quantity of power at a particular time can it take advantage of the additional pricing option under subsection (d)(2). Occidental notes that this reading also supports the congressional intent that rates under PURPA "shall be just and reasonable to the electric consumers of the electric utility and in the public interest." 16 U.S.C. § 824a-3(a)(2), (b)(1). According to Occidental, a Legally Enforceable Obligation requires a utility to purchase power at rates set potentially years in advance, and as a result, the utility needs to know that the promised power actually will be produced and readily available. Otherwise, the utility would be unable to determine how much additional power it must arrange to purchase to meet its requirements without paying a premium for last-minute purchases. Because only firm power Qualifying Facilities can provide that kind of certainty, it makes sense that only they should be able to select between the rate options.[18]

### D.

In sum, Exelon has failed to show that PURPA and FERC's Regulation mandate that all Qualifying Facilities be able to create Legally Enforceable Obligations at any time. *Power Resource III*, 422 F.3d at 238. PURPA allows states discretion in determining when a Legally Enforceable Obligation is created, and PUC Rule 25.242 falls within that discretion. *See id.* at 239. The PUC is therefore entitled to deference in defining the parameters for creating Legally Enforceable Obligations. *Id.* at 236. Here, the PUC has reasonably distinguished between Qualifying Facilities that can, and cannot, provide firm

---

[18] Indeed, as Occidental notes, the PUC is far from alone in requiring a Qualifying Facility to deliver firm power in order to form a Legally Enforceable Obligation. According to Occidental, seven other states place similar requirements on Qualifying Facilities.

No. 12-51228

power. As Occidental notes, mandatory long-term contracts between generators and utilities can burden customers by imposing prices well above the actual market prices. The PUC made a reasonable decision that only those Qualifying Facilities capable of providing reliable and predictable power may enter into such arrangements. Thus, Exelon has not proven that the PUC failed to implement FERC's PURPA regulations.

## IV.

We VACATE the portion of the judgment regarding Exelon's challenge to the PUC Order and direct the district court to dismiss for want of subject matter jurisdiction. As to the remaining claims, we REVERSE and REMAND for proceedings consistent with this decision.

No. 12-51228

EDWARD C. PRADO, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's carefully reasoned jurisdictional analysis. But I have serious reservations about the majority's arguments on the merits, and I must therefore respectfully dissent. The effect of the majority's opinion is to undermine an important federal program that promotes renewable energy. The majority rejects the considered view of the federal agency that authored the regulation in question and that enforces the program, based on nothing more than the state regulatory authority's say-so. In doing so, the majority contravenes established principles of interpretation and administrative law and disrupts the scheme that Congress intended.

This case concerns the distinct roles Congress gave to federal and state regulatory authorities in Section 210 of Title II of the Public Utility Regulatory Policies Act of 1978 ("PURPA"). Pub. L. 95-617, 92 Stat. 3117, 3144. PURPA gave the Federal Energy Regulatory Commission ("FERC") authority to promulgate rules "to encourage cogeneration and small power production" including rules that "require electric utilities to offer to . . . purchase electric energy from such facilities." 16 U.S.C. § 824a-3(a). PURPA in turn provided that "each State regulatory authority shall . . . implement [any] rule [prescribed by FERC under § 824a-3(a)]." *Id.* § 824a-3(f).

PURPA not only divided the tasks of regulation and implementation between federal agencies and states respectively; it also divided authority to challenge and review those implementation schemes. On one hand, PURPA makes state courts the avenue for judicial review of "any proceeding conducted by a State regulatory authority . . . for purposes of implementing any requirement of a [FERC] rule." 16 U.S.C. § 824a-3(g)(1)–(2) (cross-referencing 16

34

U.S.C. § 2633); 16 U.S.C. § 2633 ("Any person . . . may obtain review of any determination made under [certain provisions] . . . in the appropriate state court."). On the other hand, PURPA authorizes FERC to "enforce the requirements of [the state implementation provision]" by way of "an action against the state regulatory authority . . . for failure to comply" with the implementation requirements. *Id.* § 824a-3(h)(2)(A). In addition, PURPA entitles electric utilities and small power producers to petition FERC "to enforce the requirements of [the state implementation provision]." *Id.* § 824a-3(h)(2)(B). If FERC declines to use its enforcement authority within sixty days, "the petitioner may bring an action in the appropriate United States district court to require such State regulatory authority . . . to comply with [the implementation] requirements," and FERC may intervene as of right. *Id.*

These interlocking components of PURPA—ordering FERC to prescribe rules, giving state regulatory authorities control over implementation of those rules, and empowering FERC to enforce state compliance with the FERC rules—provide the framework for this dispute. Here, FERC mandated that "[e]ach qualifying facility[1] shall have the option . . . to provide energy or capacity pursuant to a legally enforceable obligation." 18 C.F.R. § 292.304(d)(2). The Public Utility Commission of Texas ("PUC") implemented that regulation by permitting only *some* qualifying facilities to enter into a legally enforceable obligation. 16 Tex. Admin. Code § 25.242(c) ("PUC Rule 25.242"). In response to Appellees' (collectively, "Exelon") petition for enforcement, FERC issued a declaratory order ("Declaratory Order") finding that the PUC failed to

---

[1] That is, each cogenerator and small power producer that FERC finds meets certain operating and efficiency standards under 18 C.F.R. §§ 292.203–07.

No. 12-51228

implement its rule: "we find that . . . the requirement in Texas law that legally enforceable obligations are only available to sellers of 'firm power,' as defined by Texas law, [is] inconsistent with PURPA and our regulations implementing PURPA, particularly section 292.304(d) of our regulations." *JD Wind 1, LLC*, 129 FERC ¶ 61,148 (Nov. 19, 2009).

The majority diverges from the detailed reasoning of the district court, which, like FERC, had found that the PUC had failed to implement the regulation. In doing so, the majority departs from the plain language of the regulation, which mandates that every qualifying facility shall have the option to form legally enforceable obligations. PUC Rule 25.242 deprives qualifying facilities of that option and therefore is inconsistent with the regulation. Even if the regulation did not plainly bar the PUC's regulation, the majority also errs by refusing to defer to the FERC's expert interpretation of its own regulation.

## I. DISCUSSION

We review a district court's interpretation of a federal regulation de novo. The starting point for our court's analysis is to apply standard interpretive principles to determine whether FERC (in its rule) or Congress (in PURPA) have spoken directly to the precise issue in question. *See Talk Am., Inc. v. Mich. Bell Tel. Co.*, 131 S. Ct. 2254, 2260 (2011) (first analyzing whether a "statute or regulation squarely addresses" the issue in that case); *Chase Bank USA, N.A. v. McCoy*, 131 S. Ct. 871, 878 (2011) (same); *cf. Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43 (1984) (asking at the first step "whether Congress has directly spoken to the precise question at issue" or whether the statute is ambiguous). To ascertain whether the regulation has spoken unambiguously to the question at issue, the court "avail[s itself] of the traditional means of statutory interpretation, which include the text itself, its

history, and its purpose." *See Bellum v. PCE Constructors, Inc.*, 407 F.3d 734, 739 (5th Cir. 2005) (citing *Gen. Dynamics Land Sys., Inc. v. Cline*, 540 U.S. 581, 600 (2004)).

If the regulation is silent or ambiguous—that is, it does not answer the precise question at issue—after using ordinary tools of statutory interpretation, our court then must confront a difficult issue of deference doctrine: where Congress has given important roles to both a federal agency and state regulatory authorities, and those federal and state agencies offer conflicting interpretations of the federal regulation, to which agency, if any, should we defer?[2] We typically defer to a federal agency's reasonable interpretation of its own regulation. But the Appellants and the majority assume that the discretion afforded state regulatory authorities in implementing the regulation suggests that they deserve the deference, not FERC.

As I explain below, we ought to give FERC deference because FERC is the author of the regulation at issue and the structure of PURPA suggests Congress's intent to let FERC's interpretations of its own regulation trump the state's. Yet, to be sure, we do not need to reach this question of deference because the regulation's plain language bars the PUC's interpretation.

## II. "STEP ONE"

PURPA required FERC to promulgate rules that "require electric utilities to offer to . . . purchase electric energy from such facilities." 16 U.S.C. § 824a-3(a). The statute did not do any more to describe the regulatory scheme that

---

[2] As one scholar recently observed, "State implementation of federal law is commonplace, but has been largely ignored by the interpretive doctrines of legislation and administrative law." *See* Abbe R. Gluck, *Intrastatutory Federalism and Statutory Interpretation: State Implementation of Federal Law in Health Reform and Beyond*, 121 Yale L.J. 534, 534 (2011).

No. 12-51228

would give effect to this mandatory purchase provision, leaving FERC to work out the details. FERC, pursuant to its delegated authority, issued the following regulation:

> Each qualifying facility shall have the option either:
> (1) To provide energy as the qualifying facility determines such energy to be available for such purchases, in which case the rates for such purchases shall be based on the purchasing utility's avoided costs calculated at the time of delivery; or
> (2) To provide energy or capacity pursuant to a legally enforceable obligation for the delivery of energy or capacity over a specified term, in which case the rates for such purchases shall, at the option of the qualifying facility exercised prior to the beginning of the specified term, be based on either:
>> (i) The avoided costs calculated at the time of delivery; or
>> (ii) The avoided costs calculated at the time the obligation is incurred.

18 C.F.R. § 292.304(d).

## A. All Qualifying Facilities Are Entitled to Create Legally Enforceable Obligations.

The key phrase in dispute is "Each qualifying facility shall have the option . . . [t]o provide energy . . . pursuant to a legally enforceable obligation." The majority looks at that phrase and concludes that "the plain text of the FERC regulation fails to mandate that all Qualifying Facilities be allowed to form legally enforceable obligations." Majority op. at 26 (citation and internal quotation marks omitted). I strongly disagree.

FERC spoke "in terms of the mandatory 'shall,' which normally creates an obligation impervious to judicial discretion." *Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach*, 523 U.S. 26, 27 (1998); *see, e.g.*, *Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 661–62 (2007) (language in the

38

Clean Water Act that EPA "shall approve" an application was mandatory and removed EPA's discretion not to approve the applications); *Black's Law Dictionary* 1375 (9th ed. 2009) (noting that it is the "mandatory sense [of 'shall'] that drafters typically intend and that courts typically uphold"). The majority points to no argument that would alter this presumption of a mandate.

The terms of this mandate require the state regulatory authority to preserve an option belonging to each qualifying facility to form a legally enforceable obligation. The option belongs to *each* qualifying facility, which means that it belongs to "every" qualifying facility. *See Sierra Club v. EPA*, 536 F.3d 673, 678 (D.C. Cir. 2008) ("'Each' means '[e]very one of a group considered individually.'" (quoting *American Heritage Dictionary* 269 (4th ed. 2001))). Every qualifying facility "ha[s]" the option; not the state regulatory authority. Thus, the state regulatory authority may not make the choice *for* each qualifying facility. *See* 45 Fed. Reg. 12,214, 12,224 (1980) ("The Commission intends that rates for purchases be based, *at the option of the qualifying facility*, on either the avoided costs at the time of delivery or the avoided costs calculated at the time the obligation is incurred." (emphasis added)).

Additionally, the option guarantees the ability to form a legally enforceable obligation. The term "legally enforceable obligation" is scarcely defined, and the majority assumes that this ambiguity means that the regulation does not precisely answer the question at issue. But this ambiguity does not alter in any way the regulation's mandate. Whatever the term "legally enforceable obligation" might mean is irrelevant, so long as each qualifying facility has the option to form one. From this fact we can also infer that any definition of "legally enforceable obligation" that undermines the mandate is not

permitted. So, since Qualifying facilities may include wind power producers, *see* 18 C.F.R. § 292.204(a)–(b) (covering small power producers whose primary energy source is renewable resources, including wind), and the PUC Rule defines "legally enforceable obligation" so that those producers cannot claim that entitlement, the PUC's definition of "legally enforceable obligation" violates the clear mandate. If FERC had intended categorically to limit the mandatory option, it would not have used terms such as "each" and "shall."

## B. The PUC Firm-Power Rule Makes Some Qualifying Facilities Ineligible to Form Legally Enforceable Obligations.

As the majority states, "the PUC's rule implementing FERC's Regulation permits only a Qualifying Facility that generates 'firm power' to enter into a Legally Enforceable Obligation." Majority op. at 5 (citing PUC Rule 25.242). That alone should be enough to conclude that the PUC rule "fail[s] to comply" with the implementation requirements imposed on it by PURPA. *See* 16 U.S.C. § 824a-3(f), (h)(2)(A). Because the mandatory option is the linchpin of the regulation and the PUC Rule categorically bars some qualifying facilities from exercising their mandated option, I would conclude that the PUC regulation conflicts with the unambiguous terms of the regulation.

The majority says that "there is no FERC Regulation or PURPA provision specifically addressing whether non-firm energy providers may form Legally Enforceable Obligations." Majority op. at 23. But this reading overlooks the term "each," which plainly means any and every qualifying facility. Since every qualifying facility may form legally enforceable obligations, the regulation does not need to specify which qualifying facilities, be they firm or non-firm, may form them. It would be an illogical and inconsistent result, then, to read "each" as meaning only "firm-power."

No. 12-51228

Finally, our interpretation of the regulation should give effect to the purposes of the statute. Congress identified a problem: electric utilities were monopsonies, lone buyers of energy in a market with many potential producers of energy, and "traditional electricity utilities were reluctant to purchase power from . . . nontraditional facilities." *FERC v. Mississippi*, 456 U.S. 742, 750 (1982). Congress sketched out a bold solution to that problem—mandatory purchases of energy by electrical utilities from qualifying facilities, 16 U.S.C. § 824a-3(a)—and asked FERC to promulgate rules to that effect. FERC chose a scheme that turned on making legally enforceable obligations available for each qualifying facility. In fact, FERC recognized that to encourage that sort of energy production, the regulations had to provide the certainty that comes with having a long-term obligation. Thus, FERC invoked "the need for qualifying facilities to be able to enter into contractual commitments" and "the need for certainty with regard to return on investment in new technologies" that only those long-term legally enforceable obligations could provide. 45 Fed. Reg. at 12,224. Giving only some of the qualified facilities the leverage to overcome the uncompetitive monopsonies would undermine this basic purpose. It will provide no investment certainty, and, inevitably, many developers will be unable to produce energy using the new technologies that PURPA sought to encourage.

The majority appears to endorse the view that a contrary purpose of the statute should prevail: "the congressional intent that rates under PURPA 'shall be just and reasonable to the electric consumers of the electric utility and in the public interest.'" Majority op. at 32 (quoting 16 U.S.C. § 824a-3(a)(2), (b)(1)). But none of the Appellants brings a challenge to FERC's regulation implementing PURPA, and if there were any ambiguity about FERC's consideration of those

No. 12-51228

views, FERC has made a permissible interpretation of the general statutory command.  *See Chevron*, 467 U.S. at 843.  Indeed, FERC addressed the majority's concerns for just and reasonable rates through an entirely different scheme in its regulation.  FERC used the concept of "avoided costs" to simultaneously provide nondiscriminatory pricing to the new market entrants, the small energy producers, but also accord with market rates for electricity.  *See* 18 C.F.R. § 292.304(a), (c) (setting guidelines for state avoided-cost rate-setting); 45 Fed. Reg. 12,222 ("The Commission has . . . provided that the rate for purchases meets the statutory requirements [for just and reasonable rates] if it equals avoided costs.").

The idea that the court can read FERC's regulation as violating the terms of the statute—but for the saving interpretation that Occidental offers—runs contrary to the *Chevron* canon.  It is inappropriate for the court to assert that "[b]ecause only firm power Qualifying Facilities can provide that kind of [cost] certainty, it makes sense that only they should be able to select between the rate options."  Majority op. at 32.  It may "make[] sense" to us lay judges, though I tend to think not.  But it makes as much sense to do as FERC has done—namely, to provide every qualifying facility with the option to enter into a legally enforceable obligation and trust that "in the long run, 'overestimations' and 'underestimations' of avoided costs will balance out."  45 Fed Reg. 12,224. The point is, though, that it really is not for a court to say.  Congress delegated the authority to weigh these considerations to an expert agency.  Only by displacing FERC's role as Congress's delegatee and going beyond the issue in dispute can the court offer its merely plausible reading of statutory language and conclude that FERC is doing it wrong.

42

No. 12-51228

### III. "STEP ZERO"

Supposing that we could get past the mandatory language of the statute, I would still find that the district court properly adopted FERC's view of its own regulation. The majority would have us upset this basic doctrine of agency deference because the PUC enjoys some discretion in implementing FERC regulations. The majority's conclusion that the PUC acted within its discretion to answer the supposedly ambiguous question in this case lacks foundation. But it is worth first examining the hard issue of first impression this case actually creates and why, nevertheless, deference to FERC makes sense.

**A.    The Court Should Defer to FERC's Interpretation of Its Own Regulation, Even Under PURPA's Cooperative Federalism Scheme.**

It is well-established that a federal agency's interpretation of its own regulation "'becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation.'" *Elgin Nursing & Rehab. Ctr. v. U.S. Dep't of Health & Human Servs.*, 718 F.3d 488, 492 (5th Cir. 2013) (quoting *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945)); *see also Auer v. Robbins*, 519 U.S. 452, 461 (1997). Indeed, *Seminole Rock* and *Auer* dictate deference to the federal agency's interpretation of its own regulation even when that agency's interpretation is made informally. *Elgin Nursing*, 718 F.3d at 493 ("This court and others have held that opinion letters, handbooks and other published declarations of an agency's views, including amicus briefs, are authoritative sources of the agency's interpretation of its own regulations." (citations and internal quotation marks omitted)). Therefore, if 18 C.F.R. § 292.304(d) really were ambiguous, FERC's interpretation of that regulation in its 2009 Declaratory Order would ordinarily control our court's interpretation "unless it

43

No. 12-51228

is plainly erroneous or inconsistent with the regulation."

If a statute entitles two agencies to take administrative actions based on promulgated regulations under the statute and those agencies come to conflicting interpretations of the regulation, we must ask a prior question: To which agency did the statute give "the power to render authoritative interpretations of [the] regulations"? *Martin v. Occupational  Safety & Health Review Comm'n*, 499  U.S. 144, 152 (1991).  To answer that question, courts must "infer from the structure and history of the statute" which agency should be the primary interpreter of the regulations.[3]  *Id.*

In *Martin*, the court examined the split-enforcement scheme Congress created under the Occupational Safety and Health Act ("OSH Act").  The OSH Act entrusted the Secretary of Labor with"responsibility for setting and enforcing workplace health and safety standards," but delegated authority the Occupational Safety and Health Review  Commission to adjudicate disputes, including employer challenges to the Secretary's enforcement actions.  *See id.* at

---

[3] The *Martin* test parallels the Supreme Court's *Chevron* "Step Zero" analysis, which asks whether Congress delegated authority to make interpretations carrying the force of law. *See United States v. Mead*, 533 U.S. 218, 226–27 (2001); *see also* Gluck, *supra*, at 599 ("An extension of *Mead*, or something like it, to include state implementers—that is, to take into account the specific ways that Congress utilizes state implementers to determine the level of deference the various concurrent implementers should receive—may not be a radically different approach than the one currently in use."); Jacob E. Gersen, *Overlapping and Underlapping Jurisdiction in Administrative Law*, 2006 Sup. Ct. Rev. 201, 219, 223–24 (stating that deference questions in a statute administered by multiple agencies is "best treated as a Step Zero inquiry" and discussing *Martin* as an illustration of that inquiry). Under that analysis, courts determine where to place a single agency's interpretation of a statute along a spectrum of deference.  *See Mead*, 533 U.S. at 236–37.  Courts look for that "[d]elegation of [interpretive] authority . . . in a variety of ways, as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent."  *Id.* at 227.  The analysis, then, is attentive to the structure and text of each specific statute.

147–48 (citing 29 U.S.C. §§ 651(b)(3), 658–661, 665, and 666). If the Commission ruled against the Secretary, the Secretary had "the right to seek review of [the] order in the court of appeals." *Id.* at 148.

Faced with an appeal in which the Commission and the Secretary offered conflicting interpretations of an OSH Act regulation, the *Martin* Court held that the Secretary deserved the deference. *Id.* at 152. The Court placed heavy emphasis on the fact that the Secretary—as the head of the agency that promulgates the standards—was "in a better position than . . . the Commission to reconstruct the purpose of the regulations in question." *Id.* In addition, the Court found that "by virtue of the Secretary's statutory role as enforcer, the Secretary comes into contact with a much greater number of regulatory problems than does the Commission," which adjudicated episodically based only on contested enforcement actions. *Id.* Thus, the Court concluded that the Secretary should enjoy primary interpretive authority due to the agency's "historical familiarity and policymaking expertise," *id.* at 152, and courts "should defer to the Secretary [to the extent] the Secretary's interpretation is reasonable," *id.* at 158 (emphasis omitted).

*Martin*'s statute-specific analysis should guide our analysis of the deference dilemma here. Like the delegation to the Secretary under the OSH Act, PURPA placed FERC in charge of writing rules and enforcing them. *See* 16 U.S.C. § 824a-3(a), (h)(1). In particular, 16 U.S.C. § 824a-3(h) ("Commission enforcement") empowered FERC to "enforce the requirements of [the state implementation provision]" when a state has "fail[ed] to comply" with the

No. 12-51228

implementation requirements. *See id.* § 824a-3(h)(2).[4]

Congress apparently did not just want FERC to provide its views on its regulation through enforcement actions; PURPA also confers on FERC an entitlement to intervene as of right in a petitioner's federal court action even when FERC did not use its discretionary enforcement power. *Id.* State regulatory authorities have no analogous role to either the Commission or the Secretary in *Martin.* Whereas the Commission in *Martin* had the power to hear and decide cases brought against the Secretary, a state regulatory authority enjoys no equivalent adjudicative authority. Instead, state regulatory authorities have a unique mandate to implement the FERC regulations through their own chosen state mechanisms. *See FERC v. Mississippi*, 456 U.S. at 760; *see also* 16 U.S.C. § 824a-3(f). In addition, state regulatory authorities may defend as-applied challenges to their implementation plans in state court actions, but, under federal law, they enjoy neither a special adjudicative or enforcement power. *See* 16 U.S.C. § 824a-3(g).

This scheme strongly indicates that "the power to render authoritative interpretations of [PURPA] regulations is a 'necessary adjunct' of [FERC's] powers to promulgate and to enforce national . . . standards." *See Martin*, 499

---

[4] In addition, although *Martin* did not require it, we might expect to only give deference to an agency interpretation when it colors inside the boundaries Congress gave it—i.e., when it is within the scope of its delegation. *Mead*, 533 U.S. at 227. With regard to its enforcement powers, FERC has reasonably interpreted its enforcement power to include the ability "to terminate a controversy or remove uncertainty" through the use of declaratory orders. 18 C.F.R. § 385.207(a) (interpreting enforcement authority under the Federal Power Act); *see* 16 U.S.C. § 824a-3(h)(2)(A) (directing FERC to enforce state implementation of its rules as a "rule enforceable under the Federal Power Act"). Therefore, FERC's Declaratory Order is a valid exercise of FERC's enforcement powers under the theory that the greater enforcement power necessarily includes the lesser authority to issue declaratory orders.

U.S. at 152. FERC is the author of the regulations it is asked to interpret and enforce, and FERC is thus in a "better position than" the PUC to say what those regulations mean. *Id.* We have said before that this authorship rationale is "[t]he most important reason for extending greater deference" to an agency's informal interpretation of its own regulation under the *Auer* doctrine. *Belt v. EmCare, Inc.*, 444 F.3d 403, 416 n.35 (5th Cir. 2006). Nothing about PURPA's cooperative federalism scheme detracts from this crucial reason for deference to the promulgating agency.

The layered design of the enforcement provisions further points to FERC's leading interpretive role. Although PURPA specifically provided a special implementation role for state regulatory authorities, PURPA gave FERC a trump card when it permitted FERC to bring enforcement actions against state regulatory authorities that had "fail[ed] to comply" with FERC regulations. It would be odd indeed for Congress to give FERC the power to bring enforcement actions against state regulatory authorities, only to let FERC lose every action because Congress had supposedly intended states, not FERC, to have interpretive authority. Such an outcome would nullify FERC's enforcement power and upset the "multi-layered enforcement" scheme PURPA devised. Congress appears to have intended for FERC's interpretation, not the PUC's, to have the upper hand. Here, that means we should give controlling weight to FERC's reasonable interpretation of its own regulation.

What mitigates the effect of this FERC trump for the PUC is the latitude that FERC has granted state agencies "in determining the manner of implementation of [FERC's] rules, provided that the manner chosen is reasonably designed to implement the requirements of [18 C.F.R.

§§ 292.301–14].” 45 Fed. Reg. at 12,230–31. FERC did so with a sense that states could use discretion to implement better policies. FERC noted the context of “economic and regulatory circumstances [that] vary from State to State and utility to utility” and “recogni[zed] the work already begun and . . . the variety of local conditions.” *Id.* at 12,231. The Supreme Court ratified that “latitude” language in *FERC v. Mississippi*, 456 U.S. at 751. Congress also expected meaningful interaction between state regulatory authorities and FERC, since PURPA instructed FERC to consult with state regulatory authorities before issuing regulations. *See* 16 U.S.C. § 824a-3(a) (“Such rules shall be prescribed, after consultation with representatives of Federal and State regulatory agencies having ratemaking authority for electric utilities, and after public notice and a reasonable opportunity for interested persons (including State and Federal agencies) to submit oral as well as written data, views, and arguments.”).

In light of FERC’s stated position, our court has previously said that “[w]e review the PUC’s implementation with deference because ‘[a] state has broad authority to implement PURPA with respect to the approval of purchase contracts between utilities and QFs.’” *Power Resource III*, 422 F.3d at 236 (quoting *N. Am. Natural Res., Inc. v. Mich. Pub. Serv. Comm’n*, 73 F. Supp. 2d 804, 807 (D. Mich. 1999)). Or, as we summarized it elsewhere, the state regulatory authorities exercise their discretion in “setting the specific parameters” on when and how legally enforceable obligations may be formed. *Id.* at 238 (citing FERC declaratory orders that permitted state discretion in defining parameters of legally enforceable obligations); *id.* at 239 (referring to the discretion that “FERC has given” state regulatory authorities).

This discretion is limited, though, and, in any case, it tells us little about

No. 12-51228

which agency Congress wanted to speak with the force of law.  Generally, implementation discretion is limited by the requirement that the chosen means of implementation are "reasonably designed to give effect to FERC's rules." *FERC v. Mississippi*, 456 U.S. at 751.  In addition, in some cases, PURPA gave exclusive control to FERC to implement some rules.  In *Power Resource III*, for example, the court acknowledged that PURPA gave an exclusive grant of authority to FERC over rules on the certification of qualifying facilities.  422 F.3d at 236 n.2.; *see also Indep. Energy Prods. Ass'n, Inc. v. Cal. Pub. Utils. Comm'n*, 36 F.3d 848, 853–54 (9th Cir. 1994) ("The structure of PURPA and [FERC]'s regulations[] reflect Congress's express intent that [FERC] exercise exclusive authority over QF status determinations.").

**B.    The Majority's Reasons Do Not Support Deferring to the PUC.**

I am unconvinced by the majority's reasons for deferring to the PUC's interpretation of the FERC regulations.

### 1.    No FERC Interpretation

The majority opines that there is no FERC interpretation to interpret in this case.  Not so.  First, while the majority opinion correctly notes that FERC is not a party and did not take a position before our court, the fact that FERC is not a party makes no difference.  In fact, courts regularly grant deference to non-party amici.  *See, e.g.*, *Decker v. Nw. Envtl. Def. Ctr.*, 133 S. Ct. 1326, 1336–37 (2013) (giving *Auer* deference to the EPA's interpretation offered in an amicus brief).  In any case, the FERC interpretation is "before our court" not only because its Declaratory Order is in the record and has been briefed by the parties, but also because FERC's Declaratory Order was the jurisdictional prerequisite for the case even coming to our court.  *See Power Resource III*, 422

F.3d at 235 ("If FERC does not bring an enforcement action within 60 days following the date on which a petition is filed, the utility or qualifying facility may bring an enforcement action in federal district court." (quoting 16 U.S.C. 824a-3(h)(2)(B))).

Also note that if the court required that the interpretation be argued by a party "before our court," we would actually lack a PUC interpretation, too. Before our court, the PUC has notably abandoned the interpretation of the FERC regulation that it made in the district court, instead relying entirely on the now-repudiated argument that our court lacks jurisdiction. It would seem a double standard for the majority to rely on this argument to negate FERC's interpretation while preserving the PUC's.

Second, the majority acknowledges that FERC offered its interpretation in its Declaratory Order, but minimizes the effect of that interpretation by characterizing it as a "single letter"[5] sent to Exelon. This misunderstands the situation. FERC made its Declaratory Order pursuant to its regulatory authority. *See supra* n.4. FERC published notice of Exelon's predecessor's filing in the *Federal Register*, inviting interventions and protests. *See* JD Wind 1, LLC, et al.; Notice for Petition for Declaratory Order, 74 Fed. Reg. 51147-02 (Oct. 5, 2009). FERC received briefing from the Appellants in that proceeding, and also from a variety of other industry groups, renewable energy developers, and utilities. *See JD Wind 1, LLC*, 129 FERC ¶ 61,148, at ¶ 61,630–32. Many of these intervenors were under the impression that FERC's interpretation was

---

[5] The "letter" that FERC sent Exelon is also known as a "Declaratory Order"—the preferred nomenclature. *See, e.g.*, *Indus. Cogenerators v. FERC*, 47 F.3d 1231 (D.C. Cir. 1995).

not just a one-off missive intended for a single party, but a wide-ranging policy interpretation. *See, e.g.*, *id.* at ¶ 61,631. ("Montana Renewables states that the Texas Commission's interpretation of when legally enforceable obligations can be established will negatively affect all intermittent resource QFs in the United States."). Then, FERC published its interpretation in a public reporter, available for all state regulatory authorities and regulated parties to consult. JD Wind 1, LLC, 129 FERC 61,148 (Nov. 19, 2009). There is only a single letter because that is how authoritative interpretations are often made.

## 2. *Power Resource III*

*Power Resource III* does not support the majority's holding. Two important limitations make that case inapplicable here. First, *Power Resource III*'s statement of deference was highly context-specific. This case is different. Second, that case tells us nothing about which agency deserves deference where FERC has spoken and disagrees with a state agency's interpretation of FERC's regulations.

FERC's grant of discretion to the PUC was necessarily tied to the particular issue in the case—conditions on the formation of legally enforceable obligations. Every indication shows that the *Power Resource III* court was careful not to overstate the scope of the PUC's discretion. Its crucial statement of deference, which the majority recites, accords deference only "with respect to the approval of purchase contracts between utilities and QFs."[6] The district court thoroughly discredited reliance on *Power Resource III* in its opinion below:

---

[6] Even this statement of limited deference is somewhat confusing. The deference applies to conditions on the formation of both contracts and *legally enforceable obligations*, which are emphatically not contracts.

No. 12-51228

In *Power Resource* [*III*]*,* the Fifth Circuit considered whether [the PUC]'s ninety-day rule was a valid implementation of PURPA. The ninety-day rule simply limits when in time a LEO can be created; no LEO can be established more than ninety days before the QF has power available, or will have power available. After careful analysis, and noting the discretion afforded the States in determine when a LEO is formed, the Fifth Circuit upheld the rule. [422 F.3d] at 240. . . . Unlike the firm-power rule, any wind QF can comply with the ninety-day rule; it is simply a matter of timing. Although there are no doubt considerable practical expenses and difficulties involved, in theory any QF can comply with the ninety-day rule through careful planning in advance, such as in what sequence to seek financing, obtain permitting, and begin different phases of construction, in relation to when to send LEO paperwork to a utility. . . . By contrast, the firm-power rule is simply insurmountable for an entire class of QFs. No sequence of permitting, financing, and construction will magically transform the vagaries of the wind into the constant, predictable stream of energy demanded by the firm-power rule. As such, this case falls outside the scope of guidance offered by *Power Resource* [*III*].

> . . . .
> *Put another way, Power Resource [III] reviewed [a] rule[] governing when and how a LEO is formed, whereas the firm-power rule . . . determin[es] whether some types of QF can ever obtain a LEO.*

*Exelon Wind 1, LLC v. Smitherman*, 2012 WL 4465607 at \*12 (emphasis added). The difference between that case and this one is one of kind, not degree.

The next difference between this case and *Power Resource III* is just as remarkable and legally significant. In *Power Resource III*, FERC did not offer its interpretation of its own regulation in response to the petitioner's request. *Power Resource III*, 422 F.3d at 234 (describing that "[a]fter FERC had not acted on [Power Resource Group]'s petition for 60 days, [Power Resource Group] filed a complaint"). Still, *Power Resource III* looked to (and was persuaded by) FERC

declaratory orders in determining whether it was appropriate to grant discretion to the PUC:

> *West Penn* [*Power Co.,* 71 F.E.R.C. ¶ 61,153, 61,495 (May 8, 1995),] and its progeny *Jersey Central Power & Light Co.*, 73 F.E.R.C. ¶ 61,092, 61,297 (Oct. 17, 1995), and *Metropolitan Edison Co.*, 72 F.E.R.C. ¶ 61,015, 61,050 (July 6, 1995), support the proposition that the FERC regulations grant the states discretion in setting specific parameters for LEOs.

*Id.* at 238. In other words, "*FERC has given* each state the authority to decide when a LEO arises in that state." *Id.* at 239 (emphasis added). Therefore, *Power Resource III* does not stand for unalloyed deference to the state regulatory authority in interpreting FERC's regulations. At best, it stands for deference to the state regulatory authority when FERC has taken no action and has previously announced that it will leave an ambiguous provision to the state agencies to interpret. FERC has offered a contrary interpretation to the PUC here, and so *Power Resource III* cannot control.

Still, *Power Resource III* is entirely consonant with the *Martin* analysis laid out above. The *Power Resource III* court made its deference determination contingent on whether Congress and FERC intended for the state to make an authoritative interpretation and whether the state acted within the scope of that delegation. In particular, *Power Resource III* considered the structure of the statute, *see id.* at 236 n.2, and FERC's own position that defining the parameters of LEO formation was within the state's discretion, *id.* at 238. Based on those considerations, the court necessarily concluded that the state had been assigned the role of chief implementer *and* chief interpreter of those particular rules. Adopting the "Step Zero"-like *Martin* framework merely makes explicit our underlying considerations of *Power Resource III*, and it explains why this case

is different.

### 3.    *Brand X*

In rejecting *Auer* deference for FERC's Declaratory Order, the majority invokes the *Brand X* doctrine even though it is inapposite. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980–86 (2005). That case held that "[a] court's prior construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision held that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Id.* at 982. The majority then asserts that *Power Resource III's* "prior reading of FERC's Regulation unambiguously forecloses the interpretation offered by FERC." Majority op. at 27. I disagree. As discussed above, *Power Resource III* answered a different question, so even if that case did offer an unambiguous interpretation of the regulation, that interpretation would not bind us.

In addition, as *Power Resource III* states in a portion quoted in the majority opinion, "[t]he plain text of the FERC regulation . . . fails to mandate [the] requirement [that Power Resource Group sought]." 422 F.3d at 239.   In other words, *Power Resource III* determined that the plain text of the FERC regulation is *silent* or at least *ambiguous* on the issue in question.  That means quite plainly that *Power Resource III*'s interpretation of the regulation cannot bar FERC's later interpretation.

In fact, the majority flips *Brand X* on its head in concluding that a prior judicial construction, which held that the regulation is ambiguous, can be used as a bar against deferring to a later agency construction. *Brand X* establishes the opposite holding: it ensures that a later agency construction of an ambiguous

statute or regulation is entitled to deference in spite of a prior judicial opinion that interpreted the ambiguous provision a different way. Here, the majority in effect punishes FERC for failing to defend its (purportedly identical) position in a prior case, but as *Brand X* said, "[a]gency inconsistency is not a basis for declining to analyze the agency's interpretation." *Brand X*, 545 U.S. at 981. Ultimately, the majority's point boils down to simply saying that a prior opinion of this court deferred to the PUC in implementing an ambiguous regulation.

### 4.    Superfluity Engendered by FERC's Interpretation

The next reason the majority gives for its refusal to defer to FERC is that "the reading advocated by [FERC and] Exelon would render PURPA subsection (d)(1) superfluous." Majority op. at 30. The superfluity argument goes as follows: if (d)(2) does give an advantage by permitting a qualifying facility to get as-available prices but also an ability to lock in a buyer for a period of time, then no qualifying facility would choose the (d)(1) route. The majority says this reading makes (d)(1) superfluous because it is "hard to understand why" FERC chose this bifurcated scheme for electricity sales. *Id.* at 27. But the difficulty of understanding  dynamic, complex, and technical fields is not a reason to presume superfluity.

Fundamentally, the opinion conflates the desirability of the (d)(2) option with its necessity. That is, although forming a legally enforceable obligation is desirable, that option is not always practically available, in which case (d)(1) provides a complementary or second-best scheme for qualifying facilities. Thanks in part to rules like the one our court affirmed in *Power Resource III*, a legally enforceable obligation can be harder to form. Consequently, selling power without a legally enforceable obligation can save those formation costs.

No. 12-51228

In the event that a qualifying facility begins producing energy but is barred for ninety days from forming a legally enforceable obligation, (d)(1) would allow the qualifying facility to begin selling its energy without waiting for the formation of the legally enforceable obligation.   So, even admitting my ignorance of the intricacies of electricity markets, I still can confidently say that (d)(1) would not be superfluous merely because (d)(2) is also an available option for qualifying facilities.[7]

### 5.     Concession by Counsel

Finally, the majority concludes that it should not apply *Auer* deference to the Declaratory Order because Exelon's counsel conceded the point at oral argument.  Simply put, it is our job, not counsel's, to interpret the regulation correctly and to determine whether deference to an agency is appropriate, so counsel's concession is of no legal moment.

The majority points to no case in which such a concession has mattered, and based on my research, the concessions of parties—either challenging or acceding to *Auer* deference—have never had the weight that the majority places on Exelon's concession.  In *Elgin Nursing & Rehabilitation Center*, this court noted that the party challenging a Department of Labor interpretation of its own informal regulatory document had conceded that the DOL would enjoy *Auer* deference over a reasonable interpretation.  718 F.3d at 492 n.5.  But instead of relying on that concession, the *Elgin* court concluded that the DOL interpretation was not entitled to *Auer* deference because the interpretation was of an informal regulatory document.  *Id.* at 493; *see also Castellanos-Contreras*

---

[7] The majority acknowledges that this is a satisfactory explanation for (d)(1).  *See* Majority op. at 30 n.17.

*v. Decatur Hotels, LLC*, 622 F.3d 393, 401 n.8 (5th Cir. 2010) (en banc) (noting a concession by the agency as to deference but relying on other grounds for rejecting *Auer* deference).

In sum, the majority does not provide a good reason to refuse to give controlling weight to FERC's interpretation of its own regulation. The majority's deference analysis rests on five grounds: (1) the absence of a FERC interpretation; (2) an application of *Power Resource III*; (3) an extension of *Brand X* analysis; (4) a superfluity argument; and (5) the concession of Exelon's counsel.[8]  As I explain above, these grounds do not give good reason to offset the strong basis our court has for deferring to FERC.  Therefore, assuming the regulation is ambiguous on the question at issue here, I believe the better approach would be to defer to FERC's reasonable interpretation of its own regulation, as stated in its Declaratory Order.

## IV. CONCLUSION

The majority's opinion does not persuade me that the regulation is ambiguous or that we should not defer to FERC.  Using standard tools of interpretation to uncover the FERC regulation's plain meaning, I conclude that the PUC rule conflicts on its face with the FERC regulation.  Even if the regulation were ambiguous, I would conclude that our court should defer to FERC's reasonable interpretation of that regulation according to well-established principles of administrative deference.  I fear that the majority's

---

[8] The majority also rejects *Auer* deference to FERC on the ground that it occasions a "shift in power [that] might raise . . . 'troublesome' Tenth Amendment concerns." Majority op. at 25–26 n.13.  The majority does not elaborate on what those constitutional concerns might be, so it is impossible for me to respond to the majority's statement.  In any case, the majority does not rely on this constitutional avoidance argument for its deference holding.

No. 12-51228

approach will not only prevent the realization of the goals that Congress identified when it passed PURPA; it also sets a far-reaching precedent, with the potential to impact how we review the numerous federal programs that seek to obtain the benefits of both state and federal participation. *See, e.g.*, *AT & T Corp. v. Iowa Util. Bd.*, 525 U.S. 366 (1999) (holding that the Federal Communications Commission, not a state agency, had authority to interpret a provision of the Telecommunications Act of 1996); *Alaska Dep't of Envtl. Conservation v. E.P.A.*, 540 U.S. 461, 502 (2004) (holding that the EPA could overrule the state agency's construction of the term "best available control technology" in the Clean Air Act"). For these reasons, I concur in part and respectfully dissent in part to the majority's opinion.